SUSAN M. CHEHARDY, Judge.
 

 12This is a dispute over a decedent’s estate in which the executor, who is the decedent’s son, filed suit to recover funds he alleged were wrongfully taken by the decedent’s daughter, his sister. The daughter filed a reconventional demand against the son in his capacity as succession representative, and a third-party demand against the son in his capacity as heir. The judgment awarded a sum of money directly to the son as heir, but did not satisfy the full demands of any party to the suit. We reverse in part, vacate in part, and remand.
 

 FACTS AND PROCEDURAL BACKGROUND
 

 Lula Mae Johnson Banks died on October 26, 2005. At the time of her death she was a resident of Jefferson Parish, Louisiana. The decedent left a testament in notarial form dated February 16, 1973, in which she named her husband, Elliot S. Banks, as the executor of her estate. The dispositive clause of the testament provided, “I leave my entire estate to my children, David E. Banks and Marilyn E. Banks, to be divided among them equally.” Pleadings
 

 On November 17, 2006, the decedent’s son, David E. Banks, filed a petition for appointment of a dative testamentary executor and to probate the decedent’s |slast will and testament. He alleged that Elliot Banks had predeceased the decedent; that David, as a child of the decedent and an heir, desired to be appointed dative testamentary executor; and prayed that the testament be probated and executed. The detailed descriptive list listed the following assets: a life insurance policy valued at $56,441.56; a checking account with a balance of $560.01; and a claim against Marilyn E. Banks “for funds of the decedent held pursuant to a power of attorney (believed to be between $200,000.00 and $500,000.00; further discovery required).” There were no liabilities listed; the total net estate was listed as “in excess of $57,001.56.”
 

 Pursuant to the petition, the court ordered that the testament be admitted for probate, filed, recorded, and executed, and David Banks was appointed dative testamentary executor.
 

 On December 13, 2006, in his capacity as executor, David Banks filed a petition against Marilyn Banks for an accounting and for return of funds.
 
 [1]
 
 He alleged that the decedent had executed a power of attorney on May 15, 2002, naming Marilyn as her agent and attorney-in-fact. He stated that funds had been withdrawn from the accounts and other holdings of the decedent by Marilyn under the authority of the power of attorney, but that Marilyn possessed and was using funds belonging to the succession.
 

 The executor asserted that the power of attorney granted by the decedent to Marilyn was terminated by the decedent’s death on October 26, 2005. He alleged that Marilyn failed to fulfill with prudence and diligence the mandate she accepted, and that she is responsible to the succession for the loss sustained as a result of her acts and failure to perform to the appropriate standard of care.
 

 
 *1089
 
 [/The executor sought an order directing Marilyn to provide an accounting of her performance of mandate, to deliver to the succession everything she received by virtue of the mandate, to compensate the succession for the loss it has sustained as a result of her failure to perform at the applicable standard, and to pay interest to the succession for sums of money she applied to her own personal use.
 

 On September 28, 2009, Marilyn filed a multipart pleading that included an answer to the petition. In the answer Marilyn denied the allegations of misappropriation and misuse of the decedent’s funds. Marilyn asserted that the decedent had lived with Marilyn exclusively, in Marilyn’s home, from 1986 until the decedent’s death in 2005. Marilyn alleged that in the early years of their co-residency, mother and daughter shared expenses by agreement and informal accounting, but in the later years Marilyn quit working to stay home and provide entirely for her mother, who began suffering from Alzheimer’s.
 

 Marilyn admitted that from May 24, 2002 to November 10, 2004 she received money from her mother, and attached a schedule listing the amounts. She asserted, however, that all the money she received from her mother was in “cognitive remuneration” for the services, room and board Marilyn provided for the care and keeping of her mother in her household, as her mother became increasingly debilitated by Alzheimer’s disease.
 

 The multipart pleading also included an exception of no cause of action, in which Marilyn asserted, “Each and every cash outlay embodied onerous or remunerative donations via manual gift by Mrs. Banks to Marilyn made in consideration of the daily obligations of room, board, care and supervision taken on by Marilyn for the benefit of her mother and in recompense for all such services provided.”
 

 | sIn addition, the pleading included an affirmative defense of extinguishment of the obligation by
 
 stipulation pour autrui.
 
 Marilyn alleged that she and her brother had made a verbal family agreement several years before their mother’s death, in which they stipulated that as their mother’s sole children, they jointly owed their mother a duty of care and supervision for her remaining years of life threatened due to her failing health and onset of Alzheimer’s; that Marilyn would not independently work, but would provide daily care and supervision for their mother in Marilyn’s own household without the necessity of nursing home assistance as long as physically possible; and that in return for the benefit received by David in Marilyn’s performance of their joint obligation of daily care to their mother, David would allow Marilyn to keep all funds in their mother’s estate, regardless of their source.
 

 Marilyn asserted that all alleged actions for accounting by her and for the return of funds received by her from their mother were extinguished by operation of the family agreement in consideration of all the services provided by Marilyn for their mother.
 

 The multipart pleading further raised the affirmative defense of estoppel, alleging that Marilyn stopped all outside gainful employment in August 1994 in full, complete and potentially detrimental reliance on the family agreement, and devoted her life exclusively to the daily care of their mother until December 2004, when their mother entered a nursing home, where she resided until her death on October 26, 2005. Marilyn asserted that any action against her now for accounting and return of funds should be estopped for equitable reasons of unjust enrichment flowing to David and to the decedent’s estate at the sole expense of Marilyn, due
 
 *1090
 
 to her detrimental reliance upon and performance of the family agreement.
 

 | r,The multipart pleading also included a Reconventional demand against David in his role as dative testamentary executor. In the event the court determined that Marilyn should be cast in judgment on the main demand, Marilyn sought a money judgment against the estate in compensation for her daily services, room and board provided her mother prior to death as alleged in the pleading, either as damages for breach of contractual agreement for services rendered between Marilyn and her mother, or on open account or, alternatively, for unjust enrichment.
 

 In addition, Marilyn made a third-party demand against David in his individual capacity, asserting that if she is cast in judgment in the main demand and her reconventional demand against the estate is denied, she is entitled to a money judgment against David personally in the amount of one-half or his virile share of any and all funds restored by judgment to the estate of the decedent. She alleged it is payment due her from David for her satisfaction of their joint obligation to care for their mother, owed one-half by him on the basis of his breach of the family agreement, the laws of contribution and indemnification between joint and solidary obli-gors or, alternatively, unjust enrichment.
 

 Finally, to the extent that David either denied or sought abrogation of the family agreement, and that fraud or deceit might be proven at trial in his inducement of Marilyn to exclusively perform services for their mother as per the agreement without consideration for her services, Marilyn sought a money judgment for damages and attorney’s fees against David, and dismissal of the instant action. Attached to Marilyn’s pleading as Exhibit A was a list of various disbursements to Marilyn from the decedent’s checking account and a certificate of deposit to Marilyn (as well as checks to two other relatives described as “Gift”), totaling in all $75,050.00.
 

 17Trial
 

 The matter went to trial on February 26, 2010 before a judge sitting without a jury.
 

 The executor and Marilyn each had an expert forensic accountant to testify on their behalf.
 

 The executor’s accountant, Kernion Schafer, testified as follows: At the time the power of attorney was executed on May 15, 2002, the decedent had a savings account and nine certificates of deposit, totaling $176,577.61. Between May 16, 2002 and August 21, 2006, there were deposits totaling $31,043.15. The total cash on hand over that period was $207,620.76. Describing check payments not in dispute, Schafer said there were authorized payments of $29,063.53, $2,135.96 in checks written to Marilyn and described as reimbursements, which Schafer said appear to be authorized, plus equal payments of $16,000.00 each to Marilyn and to David, for a total of $63,199.49 in authorized payments. He testified there were disputed payments of $11,000.00 each to Maxine Ferry and Ed Ferry on May 24, 2002, totaling $22,000.00, and what he described as unequal payments to Marilyn totaling $35,026.00. His report also listed as disputed a payment of $100.00 to Donald Banks (David’s son); payments of $9,686.29 to Marilyn for household expenses; and $1,851.02 in “unknown payments disbursed by Marilyn,” totaling $68,663.31 in check payments in dispute.
 

 Marilyn’s expert accountant, Jan Bate-man, testified her findings were basically in accord with Schafer’s testimony as to accounts on May 15, 2002. Bateman discovered no gross discrepancies between her findings and Schafer’s findings. Unlike Schafer’s report, her report was not intended to categorize expenses as author
 
 *1091
 
 ized or unauthorized; the purpose of her report was to show where the money came from and where it went.
 

 | sBateman calculated miscellaneous income from May 15, 2002 to September 13, 2005, at $30,304.00, including Social Security, and disbursements through September 13, 2006 at $207,620.76.
 

 She specified that in 2003 an annuity was purchased for $55,757.00, to which both David and Marilyn were made beneficiaries. In other payments, David received a total of $16,200.00, including a $100 check to his son, Donald Banks, which was a donation. There was $14,951.96 listed as funeral costs.
 
 [2]
 
 There also was a Bank One certificate of deposit in the amount of $10,000.00 they have not been able to trace. Bateman said she could not trace that $10,000.00 into Marilyn’s accounts, and could not determine what happened to that certificate of deposit.
 

 Bateman determined that funds paid to Wynhoven were directly for the decedent’s care, as were health insurance payments to Blue Cross and payments to Campo Pharmacy. Payments for “home maintenance” were for repairs to the air conditioning system, refrigerator repair, and washing machine in Marilyn’s home; payments described as “auto expenses” were for Marilyn’s vehicle. There was a $2,200.00 check described as “emergency cash” written pri- or to Hurricane Katrina. There were checks listed as unknown because they could not get copies of the canceled checks to see who they were written to or what they were for. The $11,000.00 checks written to Maxine Ferry and Edward Ferry were endorsed, then deposited in Marilyn’s account.
 

 Bateman put together a statement to quantify the value of Marilyn Banks’ services to the decedent. She calculated it two ways. First, using the room-and-board and assistance method, she valued the entire service at $133,707.00 (room- and-board = $30,027.00; cost for a sitter at nine hours a day for 960 days as | fl$103,680.00). Second, using the cost saved by the decedent’s not going into a nursing home, the value of Marilyn’s services was $94,000.00, calculated at $97.00 per day for 970 days.
 

 Bateman said her calculations differed from Schafer’s as to total donations by the decedent to Marilyn. Bateman calculated that figure as $75,050.00 in money that was given but not identified for a specific purpose.
 

 Marilyn Banks testified that her father died in 1983, and her mother moved in with her a few years later, probably around 1986-87. At that time her mother’s health was fair and she was capable of living independently. She moved in with Marilyn because she was having trouble with neighbors. Marilyn said she and her mother got along very well.
 

 When her mother came to live with her, Marilyn was working, but in 1995 she was laid off from her job. Before getting another job, Marilyn decided to take classes to improve her computer skills. Toward the end of the school course, it became more apparent that her mother could not stay alone.
 

 Her mother first began having serious problems in 2000 or 2001 and the symptoms developed gradually. By May of 2002 her mother had developed some mental deterioration.
 

 According to Marilyn, David contacted them occasionally, but did not make regular visits to their mother. Marilyn said she gave him information about their
 
 *1092
 
 mother’s medical condition, but he did not seem very interested.
 

 Originally them mother wrote her own checks, but when she got to the point that she could not write checks comfortably, Marilyn would write the check and her mother would sign it. Eventually her mother put Marilyn’s name on the checking account so she could sign her checks for payment of her bills. Marilyn testified that David insisted that Marilyn get a power of attorney for them mother.
 

 |inMarilyn testified that when the power of attorney was signed her mother had $176,000.00. While her mother lived with her, they split the cost of utilities and divided the grocery bills. Marilyn said she started taking money out of her mother’s accounts soon after she got the power of attorney, at David’s insistence. He told her to move as much money out of their mother’s name as possible, as quickly as possible, to keep it from being spent toward nursing homes.
 

 Marilyn testified that Maxine Ferry was her mother’s sister and Edward Ferry was her mother’s brother-in-law. Two checks of $11,000.00 each were paid to them, but after they endorsed the checks, they were deposited into one of Marilyn’s accounts, in the amount of $22,000.00. Marilyn said she also made payments to herself, but could not recall how many, and that her mother was aware of these transactions. Marilyn testified she did not hide anything from her mother.
 

 Marilyn testified further that David was very interested in what was going on with their mother’s money; Marilyn said she told him “most of the time” when she moved funds.
 

 In December 2004, Marilyn said she put her mother in a nursing home on the doctor’s recommendation because she could not give proper care since her mother had a feeding tube surgically implanted in her stomach, and she required a catheter.
 

 Marilyn testified she wanted to take care of her mother, and would have allowed her mother to live with her even if she did not have any money.
 

 Marilyn acknowledged she was aware that her mother’s will leaves her entire estate to her two children, to be divided equally between them. She said her mother was told that due to the forced heirship laws of Louisiana, she had to leave her estate to both heirs. According to Marilyn, her mother regretted having to do it that way, but was under the impression she could not change the will.
 

 | n Marilyn said her mother took out an annuity in 2003 and designated both Marilyn and David as equal beneficiaries. Marilyn testified that her mother told her “any number of times” that “the one that takes care of her should be the one to benefit” and that she wanted Marilyn to have what she had left in her estate. Marilyn said her mother told her the money was to be hers to keep. She admitted her mother never wrote down that desire.
 

 According to Marilyn, she and David had a “gentlemen’s agreement.” He told Marilyn he did not want “one nickel” of their mother’s money after she died and that Marilyn should have it for taking care of her all those years. The agreement was never written down. Marilyn said she thought he was “a man of his word and would live up to that.”
 

 Marilyn testified she paid for some things at her house directly from her mother’s accounts, such as car repairs. She said she furnished transportation to her mother from the early 1980s on, after her parents gave up their car. After Marilyn stopped working outside the home to care for her mother, Marilyn said, her mother wanted to put in more for expenses.
 

 
 *1093
 
 Marilyn said that after their mother died, she gave David a watch that he had given their mother for Christmas one year, but he did not express any interest in their mother’s personal belongings.
 

 Marilyn admitted she bought burial policies for her mother and herself in July 2002 and the total amount was around $15,000. According to Marilyn, her mother wanted to pay for Marilyn’s policy and did not ask for reimbursement. Marilyn said her mother offered David the same thing, but he declined, saying he was going to be buried with his wife’s family.
 

 Marilyn testified further that as her mother became more infirm, her services to her mother included being there 24 hours a day, seven days a week; bathing her, | 12cutting her hair, washing and ironing her clothes, paying the bills, preparing meals; taking her to the doctor, the dentist, the bank, and visiting. Her mother depended on her for transportation. As she became more disabled, Marilyn had to hand-feed her at the table, as well as change her bed clothes and gowns when she soiled herself. Her needs progressed as the disability progressed. When the disability was really severe she became wheelchair-bound, which Marilyn described as almost like having a baby to care for. Marilyn said she could not see putting her mother in a nursing home, however, when Marilyn could care for her as well or better than a sitter, until the catheter and the feeding tube became issues.
 

 Marilyn based the figure for calculating the cost of a sitter on a sitter she hired in 2002 to sit with her mother at the hospital, as well as a sitter whom Marilyn hired to be with her mother at home for six weeks when Marilyn was still working. Marilyn said the calculation of the value of her services for 980 days, when Marilyn took care of her twenty-four hours a day, seven days a week, covered from the time her mother was being cared for in the hospital until she went into Wynhoven.
 

 Marilyn said the only exceptions were approximately two-and-one-half hours on Tuesdays and Thursdays, when David would sit with their mother so Marilyn could go shopping. Marilyn said he did this “if it was convenient.”
 

 Marilyn said that when money was transferred to her account, she did not necessarily feel she owned it; it was moved out of her mother’s account so it wouldn’t go to the nursing home. Marilyn reiterated that they had a family agreement that whatever was left after their mother passed away would be for Marilyn for taking care of her. Marilyn insisted that agreement was mentioned more than once between her, her mother, and her brother.
 

 | ^Marilyn said when she moved money and deposited money into her own account, her mother knew that the money was going to her. According to Marilyn her mother said, “[I]f Marilyn takes care of me I want her to have what’s left.” Marilyn said her mother stated that unequivocally “any number of times” when her mind was clear, before the dementia. Marilyn said David knew about it, and her aunt and uncle knew about it also, but they died before the lawsuit came to trial. Marilyn said she mentioned it to her friend Geraldine also.
 

 Marilyn said she received no other compensation for the services she provided for her mother. She also testified that David was lying when he denied entering into this agreement with her.
 

 David Banks testified that his mother’s health was very poor for the last three years of her life; she had Alzheimer’s and was either in a wheelchair or in bed. He said when his mother first moved in with Marilyn, she did not need to be taken care
 
 *1094
 
 of. She began needing care around the time the power of attorney was written. He thought the power of attorney would enable Marilyn to get their mother proper medical care or whatever else she needed to help their mother, if she were to be admitted to a hospital or need other medical care. Their mother was not competent enough to take care of her own business. At that time he was still working on a part-time basis and didn’t know when he would be out of town.
 

 David described Marilyn as “a very frugal person.” He said that is one reason he trusted her with the power of attorney. David testified that if Marilyn had been unable to care for their mother, he would have cared for her and would not have expected compensation for it. David said he would consider it a personal responsibility to look after his mother’s care. He said their mother lived with Marilyn because they had been close all through the years; they were good friends; 114and Marilyn lived alone in a three-bedroom home, so it was assumed their mother would go with Marilyn.
 

 David said that he visited his mother while she lived at Marilyn’s home. Once in a while he would bring her fried chicken or would take her out to eat. In the last years, when she was confined to a wheelchair or bed, he went to Marilyn’s a couple of days a week to sit with their mother while Marilyn ran household errands.
 

 David testified he had no conversation whatsoever with his mother or with Marilyn about Marilyn keeping their mother’s money. He said he always thought they would split it equally, as provided in the will. He denied that he ever said anything about not wanting a nickel of the money or that it was Marilyn’s for taking care of their mother.
 

 He admitted he knew Marilyn was moving their mother’s assets before her death. He said he found that out about the time the power of attorney was signed. About six months after their mother died he asked Marilyn about receiving an inheritance, but Marilyn did not give him an answer right away. About a month later she called and told him she had decided she was not going to give him anything. David denied that Marilyn ever discussed with him any of the specific transactions in which she was taking money out of mother’s account and placing it in her own account. He said he never asked her for an accounting. He did not recall his mother ever offering to pay for his funeral services.
 

 David said he believes his mother definitely intended for him to get an inheritance, but he has received nothing other than a share of the annuity and the checks his mother wrote him when she was alive, totaling $20,000.00.
 

 David agreed that his sister did everything for their mother: drove her where she had to go; bought food for her; fed her; cleaned her; waited on her hand and |1sfoot. He said they never discussed her being paid for it, however, he feels they had an obligation to take care of their mother.
 

 He never offered to take his mother into his house because his mother never got along with his family. If his mother had needed care and had to live somewhere else, he would have let her stay in his home. David concluded, as long as Marilyn was going to take care of her, why would they relocate her?
 

 The purpose of the power of attorney was primarily so Marilyn could handle their mother’s medical needs and also her finances. He understood Marilyn would be their mother’s sole caretaker.
 

 David’s wife, Joann Banks, testified David never said anything to her about agreeing that Marilyn would get all their
 
 *1095
 
 mother’s money. Joann said David thought he was going to get half. Joann testified that if David’s mother was in need she would have felt that David owed her an obligation to take her into their house; if your mother is in need you should honor your mother and father; you should take care of them and not expect anything in return. She agreed that Marilyn took care of her mother and that Marilyn and the decedent were friends: “They were always together.”
 

 Geraldine Wendt testified she has been a close friend of Marilyn since they were in junior high school. She stated that Marilyn told her she wanted to try and keep her mother at home, because there were so many bad stories about nursing homes. Marilyn told Wendt she really wanted to take care of her mother at home, but she did not know if she would be able to do it financially.
 

 According to Wendt, Marilyn told her that David came over and told her that he did not want a nickel of the money. She remembered that Marilyn made a special call to her, because she was surprised at her brother offering to let her use her mother’s finances so she could keep her at home and not have to go back to |16work. Wendt said that conversation took place two or three years before Hurricane Katrina.
 

 Wendt said she understood that Marilyn was not returning to work so she could stay home with her mother. Now Marilyn is unable to work because she has cancer and a lot of disabilities as a result. Wendt said she often witnessed the things Marilyn had to do to take care of her mother. She would feed her, clean her, or do housework.
 

 Wendt testified further that she has never known Marilyn to do anything dishonest or untrustworthy; she would entrust her own affairs to Marilyn. Wendt admitted, however, that she never witnessed either the decedent or David telling Marilyn it was okay to take the money.
 

 Post-Trial Rulings
 

 The court took the case under advisement and rendered judgment on March 23, 2010. The court ordered Marilyn Banks to compensate David E. Banks in the amount of $29,000.00, adding, “This award of $29,000 includes payment for all losses sustained and is inclusive of interest.” The judgment made the parties responsible for their own respective attorney’s fees and costs.
 

 On April 9, 2010, David Banks filed a motion for written reasons for judgment. On April 13, 2010, Marilyn Banks filed a motion for new trial.
 

 On June 23, 2010, after a hearing, the court denied the motion for new trial and stated oral reasons for her ruling, as follows:
 

 I’ll just go on the record to say I think it was Ed or Maxine who received $11,000 each ... and that money was given back to the female, Mr. Molaison’s client in the case.... But she received an $11,000 payment ... back from Ed and Maxine, and then $10,000, and I have half here so I’m assuming there were two $11,000 payments....
 

 117If I remember correctly, there were two $11,000 payments. And then the Certificate of Deposit, $10,000 was half of the Certificate of Deposit. It must have been a $20,000 Certificate of Deposit, I’m assuming. You guys can go back and look at this and see if it makes sense to you....
 

 And then I saw that Ms. Marilyn received two $4,000 lump sums, so I went on and gave the brother $8,000 so that they were treated equally.
 

 Now, everything else I kind of felt that she was a[sic] caring for her mother and if she had to replace the AC at her
 
 *1096
 
 house, well, so be it. If she [had] to repair her car, so be it, since her mother was living with her. I did not consider those numbers. Whatever she spent on that was spent on that, but the extra money, the Certificate of Deposit, the amount to Maxine and then the payment that Marilyn received, these lump sum payments, I tried to give Mr. Banks, her brother, the same equal amounts. That’s how I came to the $29,000.
 

 I think there were two $11,000 payments or a Certifícate of Deposit for $20,000 so I gave her half — -I gave her ten and I gave him ten. The 11,000, I think there were two $11,000 payments. I gave her 11,000 and gave him 11,000. And then the $4,000 payments that she received I gave him two $4,000 payments to equal the 8,000 and that’s how I came to the $29,000.
 

 [[Image here]]
 

 [LJooking at it and considering what she had done for her mother and caring for her mother, I felt that she had extra expenses, which, you know, is what happens. I didn’t feel that she deserved everything. There was nothing to indicate that the mother wanted — there may have been some testimony but I didn’t....
 

 [[Image here]]
 

 The lump sum, I was trying to make sure each party got the lump sum payments and then everything else I felt like was just money she needed to care for her mother....
 

 On the same date, pursuant to the executor’s request, the court issued written reasons for judgment, which stated in pertinent part as follows:
 

 After considering the law, testimony, and submitted exhibits this Court determined that Defendant, Marilyn Banks, shall compensate Plaintiff, David E. Banks, in the amount of twenty-nine thousand dollars ($29,000). This award of $29,000 includes payment for all losses sustained and is inclusive of interest. Further, [ iseach party is responsible for their respective attorney’s fees and costs of these proceedings. This Court now provides the following written reason:
 

 The following calculation is how the Court arrived at $29,000:
 

 —$11,000 was ½ of the amount paid to Ed and Maxine
 

 —$10,000 was ½ of the Certificate of Deposit
 

 —$8,000 was the unequal payment to Marilyn Banks
 

 $29,000 TOTAL AWARD
 

 On November 4, 2010, the court issued amended written reasons for judgment as follows (added language in italics):
 

 After considering the law, testimony, and submitted exhibits this Court determined that Defendant, Marilyn Banks, shall compensate Plaintiff, David E. Banks, in the amount of twenty-nine thousand dollars ($29,000).
 
 The remainder of the unauthorized disbursements was used to purchase the certificates of deposit and for ordinary automobile and household expenses expended for the care of Lula Mae Johnson Banks.
 
 This award of $29,000 includes payment for all losses sustained and is inclusive of interest. Further, each party is responsible for their respective attorney’s fees and costs of these proceedings. [Emphasis added.]
 

 The following calculation is how the Court arrived at $29,000:
 

 —$11,000 was ½ of the amount paid to Ed and Maxine
 

 —$10,000 was ½ of the Certificate of Deposit —$8,000 was the unequal payment to Marilyn Banks
 

 $29,000 TOTAL AWARD
 

 
 *1097
 

 ARGUMENTS
 

 David appeals in his capacity as Dative Testamentary executor. He makes the following assignments of error:
 

 I.The trial court committed legal error in awarding one half of the amount of the improper transfers to |inDavid Banks, personally, when he was not a party to these proceedings, instead of awarding the full amount to the Succession who was the Plaintiff in this proceeding.
 

 II.The trial court committed legal error in effectively ordering that the judgment shall not bear any interest.
 

 III.The trial court committed manifest error in its calculation of the judgment, particularly its finding that the amount of unequal payments to Marilyn Banks was $8,000.00.
 

 Marilyn answered the appeal and makes the following assignments:
 

 1. The Trial Court erred in rendering Judgment against Marilyn Banks and not determining that the Main Demand of David Banks for Accounting and Return of Succession Funds was extinguished by Inter Vi-vos Payment made in accordance with valid Onerous and Remunerative Donations from the Decedent to her daughter, Marilyn Banks in return for services rendered.
 

 2. The Trial Court erred in rendering Judgment against Marilyn Banks and not determining that the Main Demand of David Banks was extinguished or estopped by Specific Performance of the Stipulation Pour Autrui between Marilyn and David.
 

 8. The Trial Court erred in not rendering Judgment for Marilyn Banks upon her Reconventional Demand against the estate of Lula Banks for the value of services rendered the decedent by Marilyn Banks as Succession creditor or alternatively under Unjust Enrichment.
 

 4. -The Trial Court erred in not rendering Judgment for Marilyn Banks upon her Third Party Demand against David Banks for the value of services rendered the decedent by Marilyn Banks as contribution for services rendered a needy parent or alternatively under Unjust Enrichment.
 

 _yLAWAND ANALYSIS
 

 Executor’s Assignments of Error
 

 No. I: Award To David Banks Individually Rather Than to David Banks as Executor
 

 A judgment cannot determine rights or award relief to persons or entities who are not parties to the litigation. La. C.C.P. art. 1841;
 
 Burfict v. Mafia
 
 /
 
 “Bad” Masons,
 
 07-466, p. 4 (La.App. 5 Cir. 11/27/07), 973 So.2d 809, 811;
 
 Ruttley v. Lee,
 
 99-1130, p. (La.App. 5 Cir. 5/17/00), 761 So.2d 777, 788,
 
 writ denied,
 
 2000-1781 (La.9/22/00), 768 So.2d 1287.
 

 David Banks as an individual is not a party to the main action between David Banks as executor and Marilyn Banks. David Banks was not a plaintiff in his individual capacity, but appears in the lawsuit as an individual only as defendant to Marilyn’s third-party demand.
 

 Any judgment in the main demand must be awarded to the executor as succession representative.
 

 Except as otherwise provided by law, the succession representative appointed by a court of this state is the proper plaintiff to sue to enforce a right of the deceased or of his succession, while the latter is under administration. The heirs or legatees of the deceased, whether present or represented in the state or not, need not be joined as parties,
 
 *1098
 
 whether the action is personal, real, or mixed.
 

 La. C.C.P. art. 685.
 

 Further, the succession representative is a fiduciary with respect to the succession, and has “the duty of collecting, preserving, and managing the property of the succession in accordance with law.” La. C.C.P. art. 3191.
 

 A dative testamentary executor as an individual is a separate and distinct person from the dative testamentary executor as an official.
 
 Hargrave v. Turner Lumber Co.,
 
 194 La. 285, 193 So. 648 (1940).
 

 1⅞1 Accordingly, the trial court erred in awarding judgment to David Banks individually, and that portion of the judgment is vacated. On remand the court is ordered to make any award in favor of the plaintiff in the main demand payable to David E. Banks as dative testamentary executor.
 

 No. II: Award of Interest on Judgment
 

 The judgment states, “This award of $29,000.00 includes payment for all losses sustained and is inclusive of interest.” That is clearly not the case, however. The court’s itemization in the amended written reasons for judgment makes it obvious that the award includes no component of interest. To arrive at an award of $29,000.00, the court added unauthorized payments of $11,000.00, $10,000.00, and $8,000.00, which add up to $29,000.00 exactly. Although the judgment states interest is inclusive, the court effectively denied an award of interest.
 

 La. C.C.P. art. 1921 provides, “The court shall award interest in the judgment as prayed for or as provided by law.” Thus, when a party prays for an award of interest in a pleading seeking a monetary judgment, the court lacks discretion to deny interest on the award.
 
 Aupied v. Aupied,
 
 09-636, p. 7 (La.App. 5 Cir. 3/9/10), 38 So.3d 899, 904. Modification of a judgment to include legal interest may be made pursuant to appeal.
 
 Dufrene v. Duncan,
 
 93-0403, p. 6 (La.App. 1 Cir. 3/11/94); 634 So.2d 19, 22.
 

 “The mandatary is bound to deliver to the principal everything he received by virtue of the mandate, including things he received unduly. The mandatary may retain in his possession sufficient property of the principal to pay the mandatary’s expenses and remuneration.” La. C.C. art. 3004. “The mandatary owes interest, from the date used, on sums of money of the principal that the mandatary applies to his own use.” La. C.C. art. 3005; La. R.S. 13:4203.
 

 | j>?The trial court erred in failing to award interest properly on the amount of the judgment. Accordingly, the judgment is vacated as to the interest award. On remand, the trial court is instructed to provide for a separate award of interest properly calculated on the principal amount of any award granted.
 

 No. Ill: The Trial Court’s Calculation of “Unequal Payments”
 

 We note, first, that for purposes of this appeal the executor concedes the trial court did not err in excluding from its calculations funds that were spent on Marilyn’s household and automotive expenses. That was covered by the court’s statement, in the amended written reasons for judgment, “The remainder of the unauthorized disbursements was used to purchase the certificates of deposit and for ordinary automobile and household expenses expended for the care of Lula Mae Johnson Banks.”
 
 [3]
 

 
 *1099
 
 The plaintiffs expert, Kernion Schafer, testified that checks Marilyn wrote to herself that were disputed, as well as the cost of the prepaid funeral plan for Marilyn, which was paid from the decedent’s funds, totaled $35,026.00. That figure did not include the $11,000.00 payments each to Ed Ferry and Maxine Ferry that were returned to Marilyn, nor the certificates of deposit that Marilyn liquidated, which totaled $20,000.00.
 

 Some of the figures the trial court calculated do not square with the evidence, however. The court awarded $29,000.00, comprising $11,000.00 as half the amount of the donations to the Ferrys; $10,000.00 for half the value of liquidated certificates of deposit; and $8,000.00 to match an unequal payment to Marilyn. The $8,000.00 figure is confusing and does not match any of the totals given by the accountants, although that number does match two separate payments | ^Marilyn made to herself in December 2004 of $8,000.00 each. The court did not refer to ten other checks that Marilyn wrote to herself.
 

 The executor argues that any award to the succession must be for the whole amount improperly withdrawn by Marilyn from the decedent’s accounts, rather than for half the amount. The succession is represented by the executor, and at issue was the gathering of assets alleged to be improperly sequestered by Marilyn. It was error for the court to leap over the issue at hand to “equalize” payments to David as an individual. Rather, any amounts owed the succession should be returned
 
 in toto
 
 to the executor for distribution.
 

 Due to confusion, however, created by the trial court’s calculations when compared with the various figures in evidence and considering the reasons for judgment, we vacate the award and remand for an evidentiary hearing in order for the trial court to recalculate any award, and consider the issues raised by Marilyn,
 
 infra.
 

 Marilyn’s Assignments of Error
 

 No. 1: Were the Funds Marilyn Took Onerous I Remunerative Donations from the Decedent to Her?
 

 No. 2: Was There a Stipulation Pour Autrui That Estops the Executor from Demanding Return of the Funds?
 

 No. 3: Reconventional Demand for Services Rendered by Marilyn and/or for Unjust Enrichment
 

 No. 4: Third-Party Demand Against David Banks for Half the Value of Services Rendered by Marilyn to a Needy Parent and/or for Unjust Enrichment
 

 The trial court did not specifically discuss any of the above issues raised by Marilyn’s pleadings. Where a judgment is silent on an issue raised at trial, it is presumed that the trial court rejected it.
 
 Aupied,
 
 09-636 at 7, 38 So.3d at 904.
 

 _J^By implication, therefore, the trial court rejected Marilyn’s defenses of onerous / remunerative donations and
 
 stipulation pour autrui
 
 and Marilyn’s demands to recover the value of her services rendered.
 

 In both her testament and the annuity policy purchased in 2003, the decedent made Marilyn and David equal beneficiaries. On the bank accounts and some of the financial instruments, however, Marilyn was listed as co-owner with the decedent. In addition, Marilyn was granted power of attorney.
 

 In denying the motion for new trial the trial court stated,
 

 [Considering what she had done for her mother and caring for her mother, I felt that she had extra expenses.... I didn’t feel that she deserved everything. ... I was trying to make sure
 
 *1100
 
 each party got the lump sum payments and then everything else I felt like was just money she needed to care for her mother.
 

 Thus, the trial court avoided addressing the factual issues relating to Marilyn’s claims.
 

 In reviewing the factual findings of a trial court, an appellate court is limited to a determination of manifest error.
 
 Hill v. Morehouse Parish Police Jury,
 
 95-1100, p. 4 (La.1/16/96), 666 So.2d 612, 614.
 

 We find it was manifest error for the trial judge to ignore the issues raised by Marilyn and simply to “make sure each party got the lump sum payments.” The court failed to address whether Marilyn proved her entitlement to additional monies under the grounds raised in Marilyn’s pleadings. Further, the figures listed by the court in the judgment do not accurately reflect the accounting evidence.
 

 Accordingly, we remand for an eviden-tiary hearing, in which the trial court is directed to address the issues raised in Marilyn’s pleadings, and to make any awards properly equate with the evidence.
 

 J¿¿DECREE
 

 For the foregoing reasons, the judgment is reversed as to the award in favor of David E. Banks individually. The judgment is vacated in all other respects and the case is remanded for an evidentiary hearing in accordance with the views expressed in this opinion. Costs of this appeal are assessed equally between the parties.
 

 REVERSED IN PART, VACATED IN PART, AND REMANDED
 

 [1]
 

 . Hereafter David Banks is referred to as "the executor” when appearing in that capacity, and as "David” when appearing in his personal capacity. Marilyn Banks is referred to as "Marilyn.”
 

 [2]
 

 . Marilyn testified the "funeral costs” figure was for the purchase of two pre-arranged funeral plans, for the decedent and for Marilyn. See Marilyn's testimony,
 
 infra.
 

 [3]
 

 . We note the court erroneously referred to purchase of certificates of deposit, when the only purchase was of an annuity. No certificates of deposit were purchased while Marilyn had power of attorney. The annuity was payable to both Marilyn and David equally.