PEYTON PETTIT GREENE

VERSUS

LANDON RONALD GREENE

NO. 19-CA-37

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 751-262, DIVISION "O"
HONORABLE DANYELLE M. TAYLOR, JUDGE PRESIDING

December 11, 2019

**FREDERICKA HOMBERG WICKER**
**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
Jude G. Gravois, and John J. Molaison, Jr.

**AFFIRMED IN PART, VACATED IN PART, AND RENDERED**
 **FHW**
 **JGG**
 **JJM**

COUNSEL FOR PLAINTIFF/APPELLANT,
PEYTON PETTIT GREENE
    Phillip A. Wittmann
    Brooke C. Tigchelaar
    Matthew S. Almon
    Bryant S. York

COUNSEL FOR DEFENDANT/APPELLEE,
LANDON RONALD GREENE
    Terri M. Miles

**WICKER, J.**

Appellant, Ms. Peyton Pettit Greene ("Ms. Greene"), seeks review of a September 26, 2018 judgment of the 24th Judicial District Court, which resulted in the involuntary dismissal of Ms. Greene's Expedited Motion for Contempt and Amended Request for Injunctive Relief Prohibiting Harassment, which she filed against her former husband Landon Ronald Greene ("Mr. Greene"). The trial court not only dismissed both motions, but also ordered that the parties "were not precluded" from recording custody exchanges of their children and, further, that a third party—Ms. Greene's current boyfriend—could not be present during exchanges.

Ms. Greene argues that the trial court erroneously applied incorrect burdens of proof to the evidence offered in support of each motion. She further asserts that she would have prevailed on both motions had the correct burdens been applied, and thus that this Court should review the facts *de novo* in light of the trial court's legal error. Finally, she asserts that the latter two orders—pertaining to custody exchanges of the parties' children—should not have been included in the Judgment, given that neither party had officially moved for such "relief." For the following reasons, we affirm in part, vacate in part, and render.

## PROCEDURAL HISTORY

The parties were married in 1997. Ms. Greene filed for divorce from Mr. Greene on July 6, 2015. On August 11, 2015, the parties entered into the first of three consent judgments governing issues of custody, support, and property. In the first consent judgment, the parties agreed to share joint custody of their three minor children, with Ms. Greene serving as domiciliary parent. They also agreed to develop a 50/50 visitation schedule and to abide by the co-parenting guidelines found in the Hearing Officer's Recommendations form. Regarding partition of the

parties' community and co-owned property, the judgment included the following provision:

> IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the parties have discussed resolving any property issues or claims by LANDON RONALD GREENE. LANDON RONALD GREENE has agreed that once the property is identified, he will sign over his interest of any co-owned property unto PEYTON PETTIT GREENE.

The judgment of divorce was granted on September 15, 2016. Thereafter, a dispute arose when Mr. Greene failed to sign over a Louisiana state income tax refund check made payable to both parties. The parties met with the Hearing Officer on October 25, 2016, after Ms. Greene filed a Rule for Contempt. The parties agreed to a second consent judgment, which ordered:

> . . . PEYTON PETTIT GREENE shall immediately receive full ownership and possession of . . . all federal tax refunds already received by PEYTON PETTIT GREENE, [and] any federal tax credits which may be claimed by PEYTON PETTIT GREENE in 2016 or future tax years.

> . . . LANDON ROBERT GREENE[1] shall promptly endorse any remaining or future additional checks which are made payable to both parties, and those funds shall be promptly received and owned by PEYTON PETTIT GREENE.

The final consent judgment, dated March 22, 2017, acknowledged that all financial issues were resolved between the parties, with the understanding that if any additional tax refunds were paid for a year in which the parties filed a joint return, "LANDON RONALD GREENE, shall promptly endorse said funds over to Plaintiff, PEYTON PETTIT GREENE."

On September 20, 2017, Ms. Greene filed an "Expedited Motion for Contempt," alleging that Mr. Greene was in contempt for violating the prior Consent Judgments by "receiving a refund check and/or credit" stemming from Ms. Greene's overpayment towards the parties' 2015 joint federal income tax

---

[1] Mr. Greene's name is incorrect. It should be Landon Ronald Greene.

return. On October 5, 2017, she also filed a "Request for Injunctive Relief Prohibiting Harassment Pursuant to La. R.S. 9:372.1."

Mr. Greene filed exceptions to the Request for Injunctive Relief, on the basis of Vagueness, No Cause of Action, and No Right of Action. On November 13, 2017, the Domestic Commissioner denied Mr. Greene's "Peremptory Exception of No Right of Action," granted Mr. Greene's "Dilatory Exception of Vagueness" and "Peremptory Exception of No Cause of Action," and gave Ms. Greene leave to amend her pleading.

Ms. Greene timely filed her "Amended Request for Injunctive Relief Prohibiting Harassment" on November 27, 2017, and again Mr. Greene filed peremptory exceptions of No Right of Action and No Cause of Action claiming that La. R.S. 9:372.1 only offers injunctive relief prior to the judgment of divorce. On March 14, 2018, the trial court denied both exceptions.

The trial took place over three days—August 17, September 4, and September 11, 2018. On September 11, 2018, at the conclusion of Ms. Greene's case-in-chief, counsel for Mr. Greene orally moved for involuntary dismissal on both motions. The Court granted Mr. Greene's motion, dismissing both Ms. Greene's "Amended Request for Injunctive Relief Against Harassment" and her "Expedited Motion for Contempt."

In its Judgment signed on September 26, 2018, the trial court included not only its denial of both motions, but also an order for the parties to put their drop-off and pick-up schedule in writing and to only communicate through Our Family Wizard from the point of trial forward unless there was an emergency. In addition the court ordered that Mr. Coates, Ms. Greene's boyfriend with whom she lived, should not be present during the custody exchanges of the children. Finally, the court decreed that neither party was precluded from video-taping custody

exchanges. Ms. Greene moved the court to grant a suspensive appeal of its judgment, which it did on October 11, 2018.

## ASSIGNMENTS OF ERROR

On Appeal, Ms. Greene raises several assignments of error:

1. Whether the District Court erred in issuing a Declaratory Judgment that was not sought by either party and on which no evidence was presented.

2. Whether the District Court erred in issuing an Injunctive Order against a nonparty, who is not subject to the Court's jurisdiction, that was not sought by either party and on which no evidence was presented.

3. Whether the District Court committed legal error in applying an incorrect burden of proof to the Appellant's Motion for Contempt.

4. Whether the District Court committed legal error in relying on an inapplicable statute when adjudicating Appellant's injunction request in direct contradiction of the District Court's earlier judgment in the litigation.

5. In light of legal error, Appellant is entitled to *de novo* review of the evidence relating to her Motion for Contempt.

6. In light of legal error, Appellant is entitled to *de novo* review of the evidence relating to her Injunction Request to prohibit harassment.

## FACTS

*Motion for Contempt*

Additional facts relating to Ms. Greene's motion for contempt are as follows:

Ms. Greene was entitled to a $93,600 federal income tax credit for the 2015 tax year. The Greenes filed a joint federal income tax return for the 2015 tax year. According to that return, Ms. Greene had, to that point, personally overpaid a total of $93,600 towards the couple's tax liability, and the couple would be owed a

credit in that amount, which they could either apply towards their 2016 tax liability, or elect to have refunded to them in cash.  Because the Greenes divorced on September 15, 2016, however, they each filed separate tax returns for the 2016 tax year.  In filing his individual return, Mr. Greene made no attempt to claim the credit for $93,600 that he and Ms. Greene had been owed as a couple.  Ms. Greene did claim the credit on her 2016 individual tax return, as was her right per the consent judgments mentioned above, and applied it towards her tax liability for that year.

In late July of 2017, Ms. Greene received a notice from the IRS marked "Third Reminder" which informed her that she owed over $93,600 in taxes.  On or about August 8, 2017, Ms. Greene contacted Mr. Greene seeking his help in retrieving the funds for her.  Ms. Greene's CPA and tax attorney had accurately surmised that the credit had been assigned to Mr. Greene's account instead of Ms. Greene's—IRS policy is to assign such credits to the social security number of the person listed as the "taxpayer" on the return, and Ms. Greene was listed as the "spouse."  Ms. Greene's tax attorney, Laura Plunkett, also contacted Mr. Greene on that date asking that he reach out to the IRS to confirm their suspicions and seek instructions on how to transfer the credit to Ms. Greene.

After several subsequent conversations with Ms. Plunkett regarding the issue, Mr. Greene attempted to call the IRS directly on September 13, 2017.  Mr. Greene explained that he was unable to navigate the automated phone tree to speak with an actual person that day.  On September 15, 2017, Ms. Greene contacted the IRS.  She claimed that she was told by an agent during that phone call that the credit was "gone," and that her only course of action was to take Mr. Greene to court to obtain the funds.

Four days later, on September 19, 2017, Mr. Greene emailed Ms. Plunkett to alert her that his attempt to resolve the issue by speaking with the IRS personally

had failed. In the same email, Mr. Greene indicated that he had contacted his CPA, Mr. Tommy Doussan, about the issue, that Mr. Doussan had already contacted Ms. Plunkett, and that Mr. Doussan had provided a different telephone number to try.

On September 20, 2017, Ms. Greene filed an Expedited Motion for Contempt stating that Mr. Greene was "in violation of this Court's Consent Judgment, by receiving a refund check and/or credit associated with the income tax refunds or credits owed to Ms. Greene." Mr. Greene was served with the motion for contempt on September 25, 2017.

On September 27, 2017, Mr. Doussan sent a Power of Attorney to Mr. Greene, which he filled out and promptly returned. Mr. Doussan was thereafter able to speak with the IRS on Mr. Greene's behalf. He learned that the IRS had sent several notices to Mr. Greene regarding the allocation of the tax credit without receiving a response. Given that the deadline for directing the credit had passed, the IRS would be issuing a refund check to Mr. Greene by October 9, 2017. The IRS instructed Mr. Doussan that Mr. Greene would have to wait for the check to arrive, write "VOID" on it, and send it back to the IRS with a signed statement directing that the credit be assigned to Ms. Greene.

Mr. Greene then emailed Ms. Plunkett a redacted version of his communications with Mr. Doussan (primarily leaving out the fact that numerous notices had been sent regarding the tax credit), and requested that Ms. Plunkett prepare the statement for the IRS that he needed to sign. On October 11, 2017, Mr. Greene received the refund check from the IRS. He immediately voided it, signed a statement prepared by Ms. Plunkett, and provided the documents to Ms. Greene.

***Request for Injunction Against Harassment***

Additional facts relative to Ms. Greene's request for an injunction prohibiting harassment are as follows:

Ms. Greene alleges that since before the divorce was finalized, Mr. Greene has "consistently engaged in harassing and threatening behavior towards Ms. Greene." At trial, Ms. Greene attempted to establish a pattern of harassment on the part of Mr. Greene occurring over two years—beginning with their July 6, 2015 separation and ending with her October 5, 2017 filing of her Request for Injunctive Relief. Ms. Greene presented documentation of about a dozen specific episodes in the form of email or text correspondence and video recordings taken by both parties. Most of these episodes occurred during custody exchanges.

The parties never reduced a custody arrangement or schedule into writing, beyond merely agreeing to share custody 50/50. However, Ms. Greene relayed what she believed to be the parties set custody schedule during her direct examination at the injunction proceedings. Since the beginning of their separation in July of 2015, the parties adhered to a regimen of daily morning custody exchanges of their three minor children. One of their daughters attended school in Metairie, while the other children went to school uptown. The parties developed a routine whereby every morning Ms. Greene would drive their daughter to school in Metairie, while Mr. Greene would take the uptown group, regardless of where the children had spent the night before. As for where the children would spend each night, the parties agreed to have the children stay with Mr. Greene on Sundays, Mondays, and Tuesdays, and with Ms. Greene on Wednesdays, Thursdays, and Fridays. Saturdays alternated on a weekly basis.

As previously stated, most of the episodes Ms. Greene cites as harassment occurred during these daily custody exchanges. The first cited episode of alleged harassment occurred on August 27, 2015, within a month of the couple's separation. Ms. Greene had by then required Mr. Greene to abide by strict "boundaries" that she set and informed Mr. Greene of via text message and email. Ms. Greene instructed Mr. Greene, when picking up his children, to park his

vehicle no closer than across the street from the former family home at 1409 Homestead Avenue and to remain in his vehicle for the duration of the exchange. Mr. Greene admitted to ignoring these boundaries on occasion. Ms. Greene produced a video recording of the August 27, 2015 incident that Mr. Greene had taken with his cell phone, unbeknownst to her at the time. The video captures a conversation between Mr. Greene and Ms. Greene in the foyer of the Homestead residence while Mr. Greene waits for the children to finish getting ready to leave. Mr. Greene is heard saying that he is trying to tell Ms. Greene how he feels. Ms. Greene explained, at trial, that she was uninterested in Mr. Greene's attempts to reconcile.

Evidence of several other episodes was introduced to prove that Mr. Greene did not adhere to Ms. Greene's demands to remain in his vehicle across the street during custody exchanges. Nor did Mr. Greene obey a further demand to cease recording the exchanges once Ms. Greene became aware that he was doing so.

Ms. Greene produced video documentation of one of the custody exchanges at the Homestead residence from January 9, 2017. The footage was originally taken by a security camera that Mr. Greene had installed at the Homestead residence years prior. The video shown in court was a recording Ms. Greene had taken with her phone of the raw footage as she narrated what was going on. The video showed Mr. Greene standing on the front porch of the Homestead residence, waiting for his children to come outside, with his car parked on "Ms. Greene's" side of the street. Ms. Greene alleged in her testimony that as he stood there, Mr. Greene engaged in "threatening" behavior—"waiving at us, flipping us off, saying—mouthing something. I have no idea what. Videoing." Jonathan Coates, Ms. Greene's boyfriend who lived in her home, testified that he was inside the house that day and that the waiving, winking, and shooting the bird was directed at

him. He also claimed that the silent video captured Mr. Greene saying the words, "[s]ue, motherfucker" to Mr. Coates.[2]

Ms. Greene testified that a second incident allegedly occurred at some other point on that same day of January 9, 2017, this time while she was dropping the children off at Mr. Greene's home. The second incident was not recorded, though Ms. Greene referred to it in an email to Mr. Greene after the fact. Ms. Greene testified that during this incident, Mr. Greene came out to her vehicle, opened the passenger-side door, leaned in, and called her a "whore."[3] Mr. Greene admitted to these allegations during discovery.

Ms. Greene also presented second-hand security camera footage from March 19, 2017, showing Mr. Greene standing on the front porch of the Homestead residence during a custody exchange. On this occasion, Mr. Greene allegedly engaged in ringing the doorbell repeatedly, video-recording Ms. Greene as she answered, and "making fun" of Ms. Greene's demands that he not record her. One cannot see the door or the doorbell from the video, and the surveillance footage does not reproduce sound.

On May 11, 2017, Mr. Greene allegedly engaged in similar behavior. On this occasion, Ms. Greene alleged that Mr. Greene crossed the threshold of the front door to enter the house while waiting for the children during a custody exchange. The trial court noted for the record that the video introduced was a "video of a video," which obviously left out parts of the exchange and did not actually show Mr. Greene inside the house.[4]

---

[2] Ms. Greene narrated as she recorded the video of the security footage with her phone saying, "looks like he is waiving to a kid."

[3] Requests for admissions propounded on Mr. Greene used the singular word "whore," while Ms. Greene testified in court that Mr. Greene used more profane language, including the word "whore." Mr. Coates also testified to the event using the language in Ms. Greene's direct testimony although he was not a witness to the incident.

[4] The security camera that captured the footage of this incident is allegedly mounted on Ms. Greene's porch facing down onto the stoop, not into the house. Ms. Greene claimed during her direct examination that Mr. Greene admitted to entering her house on this occasion during a prior deposition. The portions of Mr. Greene's deposition that were made part of the record do not include such an admission.

From the time of the parties' separation, Ms. Greene was especially keen that Mr. Greene not be allowed to enter or even view the inside of the home she occupied. In this effort, she prohibited the children from using FaceTime to video chat with their father while inside the house. Ms. Greene opined that Mr. Greene was "obsessed with my life, with accessing my home, trying to access my home." As evidence of his intentions, Ms. Greene relayed an incident that occurred on a Saturday in June of 2016.

Ms. Greene cited this incident as the first of two wherein Mr. Greene had attempted to "use[] her children to gain access to her house." Mr. Greene had taken the children out to celebrate a birthday, and on the way home, they made an unscheduled stop by Ms. Greene's Homestead residence to put some leftover cake in the refrigerator. Ms. Greene and her boyfriend were at her home at the time. The children knocked on the door, but it was locked, and no one came to answer. None of the children were allowed to have a key because, according to Ms. Greene, "I know he [Mr. Greene] wants nothing more than to get into my house." However, Ms. Greene's car was in the driveway, and the children knew the code to the keyless entry. Mr. Greene showed the children how to use the code to enter Ms. Greene's vehicle and get to the garage door opener. Ms. Greene rarely locked the door between the house and the garage, so by raising the garage door, the children were able to get inside and drop the cake off.

The second incident Ms. Greene cites as evidence of Mr. Greene's desire to use her children to enter her home occurred after Ms. Greene moved to a new residence in Savannah Ridge in May of 2017. Ms. Greene reiterated that the same boundaries applied to Mr. Greene regarding the new house. Ms. Greene was away from home when she received a call from her oldest daughter, Levin, who at the time was with Mr. Greene. Levin had left something she needed inside the house and, not having a key, asked her mother for the combination to the home's garage

entry system so she could get inside through the back door. Ms. Greene was surprised that Levin was even aware of the garage entry system, given that she had never told her children about it and it was "camouflaged" against the home's stucco outer-wall.[5] She refused to give Levin the combination, and lied that the system was broken, again out of a professed fear that Mr. Greene would love nothing better than to use that information to gain entry to her house.

Ms. Greene recalled another incident in which Mr. Greene failed to abide by her rules that Mr. Greene remain in his designated area across the street from the house at Savannah Ridge. On September 27, 2017, Mr. Greene had picked Levin up from Ms. Greene's Savannah Ridge residence to bring her to an event. Ms. Greene called Mr. Greene to come back because Levin had forgotten an article of clothing that she needed. Mr. Greene allegedly harassed Ms. Greene this time by walking to the front door himself to retrieve the items —as opposed to sending Levin—and ringing the doorbell multiple times. Ms. Greene called the police on this occasion, and installed security cameras sometime afterward. Ms. Greene described this event as "a last straw . . . It was just one more event where he ignored the boundaries."

As to Ms. Greene's allegation that even when Mr. Greene remained in his vehicle, he persisted in video-taping custody exchanges despite Ms. Greene's demands that he stop, at trial, she produced a seventeen second video clip from the morning of October 24, 2017. The video was taken by Mr. Greene and produced in response to a discovery request from Ms. Greene. It showed that Mr. Greene was stationed outside the Savannah Ridge residence during a morning custody exchange when Mr. Coates walked across the home's front lawn. Mr. Greene's act of harassment on this occasion was allegedly the recording of the video, given that Ms. Greene had ordered him to stop and he had once again defied her.

---

[5] Ms. Greene testified that Levin had learned about the existence of the entry system from Mr. Greene.

Mr. Greene engaged in this particular form of alleged harassment multiple times, as he admitted that he recorded custody exchanges regularly. Another of Mr. Greene's videos from January 4, 2018 was introduced which captured Mr. Coates on the front lawn of the Savannah Ridge residence before a morning custody exchange.

Three episodes of alleged harassment involved Ms. Greene receiving unwanted gifts. The first occurred during Christmas of 2015, five months into the parties' separation. Ms. Greene received a bundle of products from Victoria's Secret—including "So Sexy" shampoo and conditioner, "Love Spell" lotion, and "Tease" body spray—gifted to her by her oldest daughter, Levin, aged 13 at the time. Knowing that Mr. Greene had purchased the items for the children to give to their mother, Ms. Greene was offended by the gift and confronted Levin, who in turn confronted Mr. Greene. Mr. Greene explained in his testimony that he completed his Christmas shopping online that year while recovering from an injury. He was purchasing gifts for his daughters from PINK, by Victoria's Secret, and at the same time, he purchased the bath and body kit that Levin eventually gave to Ms. Greene for Christmas. Mr. Greene denied ever seeing what was written on the individual bottles before his daughter informed him of Ms. Greene's angry response to the gift.

Second and third, Ms. Greene received a bouquet of flowers for her birthday in June 2016, and then for what would have been the parties' eighteenth wedding anniversary in February 2017. Ms. Greene testified that, though she did thank Mr. Greene for the flowers on her birthday in June of 2016, she also promptly contacted her attorney, who formally threatened Mr. Greene with legal action if he sent Ms. Greene gifts again. Mr. Greene explained that the flowers were sent due to the fact that he had neglected to timely cancel a subscription to a flower delivery service that he had arranged for years earlier, which automatically sent flowers to

Ms. Greene at their Homestead address on her birthday and their wedding anniversary.

Ms. Greene and Mr. Coates also testified to various miscellaneous examples of alleged harassment by Mr. Greene. Both testified that Mr. Greene had carried a weapon during custody exchanges[6] and that Mr. Greene had taunted Mr. Coates on numerous occasions and had "shoulder checked" him once. Ms. Greene testified that Mr. Greene's physical presence threatened her and that Mr. Greene was an angry person.

We now address Ms. Greene's assignments of error on appeal.

## Jurisdiction of the Court to Order that Neither Party is Precluded from Video Taping
### (Appellant's Assignment of Error No. 1)

Ms. Greene's first assignment of error stems from the trial court's order that "neither party is precluded from videotaping, photographing, or recording the custody exchanges for his/her own protection against false accusations." Ms. Greene characterizes this portion of the order as a declaratory judgment issued by the court *sua sponte* and alleges that the court exceeded its jurisdiction by "granting relief that neither party requested" and "decid[ing] a controversy that the litigants had not raised."

Courts lack the authority to decide controversies which the litigants have not raised. *See Tassin v. Setliff*, 470 So.2d 939, 41 (La. App. 3rd Cir. 1985). However, "when issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleading[s]." La. C.C.P. art. 1154. Furthermore, when a party is entitled to relief based on the "averments contained in the pleadings and the evidence," the final judgment of the court must grant the appropriate relief, even if the party has

---

[6] Both Ms. Greene and Mr. Coates admitted at trial that they had never actually seen a gun but only an imprint of something inside Mr. Greene's pocket that they believed was a gun.

not demanded such relief or included a prayer for general and equitable relief in the pleadings. La. C.C.P. art 862; *Tassin*, 470 So.2d at 940–41.

A declaratory judgment is a form of relief, the purpose of which is to alleviate uncertainty and insecurity with respect to rights, status, and other legal relations. La. C.C.P. art. 1881. Declaratory judgments may function to express the opinion of the court on a legal question without ordering anything to be done. *Williams v. City of Baton Rouge*, 02-0339 (La. App. 1 Cir. 2/14/03), 848 So.2d 9, 13. A party is entitled to relief by declaratory judgment when "his rights are uncertain or disputed in an immediate and genuine situation, and the declaratory judgment will remove the uncertainty or terminate the dispute." *Spicer v. Spicer*, 2010-1577 (La. App. 1 Cir. 3/25/11), 62 So.3d 798, 800.

In support of her position, Ms. Greene points to *Gibson v. Gibson*, a third circuit case reversing an award of permanent spousal support which had not been requested by the former wife at the time the trial court granted final judgment of divorce. 592 So.2d 855, 857 (La. App. 3rd Cir. 1991). The court found that the relief was neither requested, nor "tried by express or implied consent" of both parties. *Gibson*, 592 So.2d at 857–58. While the issue of each spouse's fault was litigated, questions of the claimant spouse's means and expenses where merely "glossed upon." *Id.* Since there was a lack of sufficient evidence in the record upon which the trial court could have fairly adjudicated *all* elements of a claim for final support, the grant of relief was not warranted.

The fourth circuit in *Hyman v. Puckett* found that when an issue has been fully tried on the merits, a declaratory judgment can be necessary and proper despite not having been prayed for. 15-0930 (La. App. 4 Cir. 5/4/16); 193 So.3d 1184, 1191. The Hymans sought a permanent injunction to prevent the Pucketts from constructing a fence on a strip of property adjoining their lands, the ownership of which was uncertain. *Id.* The court held that although the Hymans

did not request that the court adjudicate the issue of ownership, the determination was necessary to properly consider the request for permanent injunction. *Id.*

In this case, the issue that the order in question sought to address—whether or not the parties enjoyed the right to record custody exchanges—was raised and tried at length during the proceedings. Ms. Greene first raised the issue in her Amended Request for Injunctive Relief Prohibiting Harassment by listing recording without Ms. Greene's permission among specific examples of Mr. Greene's harassing behavior. A great deal of the evidence presented at the hearings focused on the fact that "Ms. Greene has told Defendant not [to] record her," and despite that admonishment, Mr. Greene recorded calls and video conversations he was a party to and videoed custody exchanges with his cell phone prior to installing a dash cam in the rear side window of his vehicle. The evidence presented did not contradict Mr. Greene's contention that he only videotaped on occasions when the parties' children were being exchanged.[7]

Also, though the parties have routinely recorded each other during custody exchanges, all uncertainty as to their mutual right to do so seems to lie solely with Ms. Greene. Her testimony revealed that, although she has security cameras which capture exchanges, she has routinely and adamantly objected to Mr. Greene's recording of the exchanges since the beginning of their separation, even claiming it was illegal at one point. In doing so, she betrayed clear confusion as to Mr. Greene's rights under state and federal law. This confusion seems to have partially motivated her request for injunctive relief which asserts that Mr. Greene records the exchanges specifically to "torment Ms. Greene by defying her wishes." Mr.

---

[7] Ms. Greene's pleadings accused Mr. Greene of videotaping her, her guests, and her property, and Mr. Coates testified that Mr. Greene would sometimes show up early to pick the kids up and have the camera trained on the house or Mr. Coates while he was in the yard. The parties exchanged children every day, and the trial judge did not abuse her discretion in accepting Mr. Greene's version of the events.

Greene claimed, however, that he records the exchanges to protect himself against false allegations.

This Court finds that the legal right of both parties to videotape, photograph, or otherwise record the custody exchanges was necessarily decided by the trial court when considering whether Mr. Greene should be enjoined from recording per Ms. Greene's request. The time and vigor devoted to arguing the issue merited more than a mere denial of injunctive relief to remove the uncertainty about Mr. Greene's rights and to terminate the dispute. Therefore, Mr. Greene was entitled to the declaratory judgment allowing both parties to videotape exchanges for their protection, and that portion of the judgment is affirmed.

## Jurisdiction of the Court to Restrict Mr. Coates' Presence at Custody Exchanges
### (Appellant's Assignment of Error No. 2)

Ms. Greene's second assignment of error disputes the legality of a portion of the judgment of the trial court which states, "Mr. Coates, Peyton Greene's boyfriend, shall not be present during any custody exchanges at any location." Her concern with this particular portion of the judgment is two-fold: she claims first, that the relief was neither requested nor litigated, and second, that the court had no legal authority to issue an injunctive order against a person who was not a party to the litigation.

The same rules cited above apply. Courts cannot decide issues not raised by the parties, but the pleadings may be expanded, in a sense, by issues that are actually litigated at trial. La. C.C.P. art. 1154; *See Tassin*, 470 So.2d at 41. When a party is entitled to relief based on the pleadings and the evidence, the final judgment of the court shall grant appropriate relief. La. C.C.P. art 862; *Tassin*, 470 So.2d at 940–41.

Ms. Greene is correct that "[n]either party filed a motion seeking to enjoin Mr. Coates from being present at the location of custody exchanges." However,

the bulk of the alleged harassment for which Ms. Greene was seeking an injunction took place during exchanges of the parties' children, and the evidence suggests that, on those occasions, Mr. Coates, who played no apparent role in the actual exchange, was frequently unnecessarily present.

In her petitions and at trial on the motion to enjoin Mr. Greene, Ms. Greene used examples of behavior directed at or witnessed solely by Mr. Coates in an attempt to prove that Mr. Greene harassed her. According to Ms. Greene's Amended Request for Injunctive Relief:

> Mr. Greene has also similarly harassed Ms. Greene, through her boyfriend Jonathan Coates, by repeatedly and persistently ringing the doorbell, by calling attention to the fact that Mr. Greene is filming his interactions with Mr. Coates and carrying a weapon, by silently mouthing vulgarities at Mr. Coates, by making vulgar hand gestures at Mr. Coates, and by taunting Mr. Coates by making "kissing" noises with his mouth.[8]

Mr. Greene did admit that there was tension between himself and Mr. Coates, but suggested that Mr. Coates made a point to be outside the house when Mr. Greene came to pick up the children in an attempt to goad Mr. Greene into a physical altercation. Mr. Greene also suggested at trial (though not in his pleadings) that if an injunction was needed, it should be directed at Ms. Greene and Mr. Coates, "especially Mr. Coates, who has been told not to be present at the exchanges, but makes it a point to be present and harass Mr. Greene."

Additionally, Ms. Greene's request for injunction presented the question for the trial court to consider an appropriate course of action which would make custody exchanges run more smoothly for the benefit of the children when Ms. Greene claimed, "Due to the fact that Mr. Greene has so harassed Ms. Greene and

---

[8] Both Mr. Coates and Ms. Greene admitted that they never actually saw Mr. Greene carrying a weapon during custody exchanges, and the court noted that with the exception of one video showing Mr. Greene "flipping the bird" and waiving, the evidence introduced by Ms. Greene did not show Mr. Greene engaging in the other behavior complained of. Furthermore, when Ms. Greene introduced the prior mentioned video into evidence, it was discovered that Ms. Greene could not personally attest to what was being said in the video because she did not hear it. Mr. Coates was the only one who was personally present at the time.

Mr. Coates during changes in custody of the parties' minor children, the children have been forced to witness some or all of these instances of harassment."

It is clear that the trial court's order that Mr. Coates be kept away from the exchanges was responsive to the "averments of the pleadings and the evidence." *See Buchert v. Buchert*, 93-1819 (La. App. 1 Cir. 8/26/94), 642 So.2d 300, 303. The next issue is whether the order is proper as written.

Ms. Greene argues that the order is an impermissible adjudication of a non-party's rights. Mr. Greene defends the order by construing it as requiring Ms. Greene to ensure that Mr. Coates is not present at the site of custody exchanges, wherever they might occur.

According to La. C.C.P. art. 2002, a judgment rendered against a defendant who has not been served and who has not waived objection to jurisdiction is an absolute nullity. It is a settled notion that a judgment rendered against an entity which is not a party to the suit is an error of law requiring reversal of the judgment. *Reed v. La. Bd. of Pharmacy*, 96-1792 (La. App. 1 Cir. 9/19/97). 700 So.2d 926, 928. *See In re Succession of Banks*, 11-26 (La. App. 5 Cir. 6/29/11); 71 So.3d 1086, 1097 ("a judgment cannot determine the rights or award relief to persons or entities who are not parties to the litigation").

No petition or third-party demand names Mr. Coates as a party to the litigation. Therefore, Ms. Greene's interpretation of the order as enjoining Mr. Coates would render the order unlawful, given that Mr. Coates is not a party. However, Ms. Greene's interpretation provides only one reasonable reading of the order's language. The order is not sufficiently clear as to totally foreclose the reasonableness of Mr. Greene's interpretation of the order's language as enjoining Ms. Greene from allowing Mr. Coates to be present at custody exchanges.

Louisiana jurisprudence provides the following guidance regarding how to construe the language of a judgment when it is unclear:

> In construing a judgment, the entire context must be considered, and in the event of doubt or ambiguity, it is proper to consider the pleadings, subject matter of the suit, reasons for judgment, and other matters of record in order to arrive at an interpretation *consistent with a proper decree* on the facts and law presented. *Dodd v. Dodd*, 568 So.2d 1134, 1138 (La. Ct. App. 1990) (emphasis added); In re *Succession of Beard*, 13-1717 (La. App. 1 Cir. 6/6/14), 147 So.3d 753, 760 (citing *Williams La Firm v. Board of Supervisors of Louisiana State University*, 03-0079 (La. App. 1 Cir. 4/2/04), 878 So.2d 557, 565; *State, Dep't of Transp. & Dev. v. Sugarland Ventures, Inc.*, 476 So.2d 970, 974 (La. App. 1 Cir. 1985), *writ denied*, 478 So.2d 909 (La.1985).

A provision in a judgment should also be interpreted so that it is "consistent with the other (unambiguous) provisions in the same judgment, and such that the judgment as a whole is consistent with the evidence in the record." *Palermo v. Port of New Orleans*, 04-1804 (La. App. 4 Cir. 1/19/07), 951 So.2d 425, 433, *writ denied*, 07-0363 (La. 6/13/07), 957 So.2d 1289. Also, interpretations of judgments, like interpretations of statutes, should avoid a construction that would lead to absurd results. "The ruling should be interpreted in such a manner as to render its meaning rational, reasonable, and logical." *State v. Thompson*, 16-0409 (La. App. 4 Cir. 11/23/16), 204 So.3d 1019, 1030.

Construed as directing Ms. Greene, rather than Mr. Coates, to take action, the order would be an appropriate exercise of the court's jurisdiction, given that Ms. Greene is a party to the litigation. The fact that Mr. Greene's interpretation of the order is the only one under which the order would be legally "proper" favors selecting that interpretation over the alternative. In light of the record as a whole, construing the order as being directed toward Ms. Greene would be more consistent with the proceedings because, up until the judgment, only Mr. Greene's and Ms. Greene's rights had been subject to adjudication. It makes little sense to suppose that the court, in rendering the order, was attempting, for the first and only time in the course of litigation, to adjudicate the rights of Mr. Coates. Therefore, Mr. Greene's interpretation of the order is the more rational and logical of the two choices as well.

Common sense would suggest the trial court obviously meant for the order to be understood as directive to Ms. Greene, given that Louisiana courts have routinely placed similar requirements on parties to a divorce when the presence of a party's non-party significant other has proved disruptive to the best interest of the parties' children.

For example, in *Howard v. Oden* the Second Circuit heard a mother's appeal of a trial court order holding her in contempt for her repeated failure to follow the court's order disallowing contact between her children and her then boyfriend. 44,191 (La. App. 2 Cir. 2/25/09); 5 So.3d 989, *writ denied*, 09-0965 (La. 6/26/09) 11 So.3d 496 (Mem). The requirement: "Mother shall allow no contact whatsoever between the children and her current boyfriend, Chad Smith. He is not to be allowed in the home if any of the children are present. He is not to speak to the children by phone or in writing" fell within the purview of the court to issue given that the penalty for the order's violation was imposed against the mother, not the third party. Likewise, if the order in this case was clearly directed toward Ms. Greene, and Mr. Coates continued to be present at custody exchanges in violation of the order, Mr. Greene would be able to file a motion for contempt against Ms. Greene.[9]

In *State ex rel. H.H.*, a mother assigned error to a juvenile court judgment which barred all contact between the children and the mother's former husband (C.K.) based on substantiated allegations that he had sexually abused the children. 2009 WL 3447389, 09-0073 (La. App. 1 Cir. 10/27/09). The mother also assigned error to the juvenile court's extension of the no-contact order to forbid contact of the children with J.K., C.K.'s mother, following C.K.'s death. The Mother argued that the juvenile court abused its discretion in both imposing the no-contact order

---

[9] This Court recognizes that if the order's language were upheld as written, any attempt to enforce the order by filing a motion for contempt against Mr. Coates would be futile because he is not a defendant in the litigation at issue.

against C.K., given that hearsay evidence against him was improperly considered; and also by extending the order to J.K., given that she was never accused of harming or posing any danger to the children whatsoever.

In upholding the no-contact order against C.K., the court explained that, even if the trial court improperly heard hearsay evidence, the order could not be disturbed because "after considering all of the other admissible testimony and evidence presented in this case . . . we [could not] conclude that the juvenile court's ruling was manifestly erroneous." *Id.* Likewise, with regard to its decision to uphold the order's extension to J.K., the court explained that it could not find that the ruling was "unreasonable or not in the best interest of the children, and [the court was] unable to say that [the lower court's ruling] was clearly wrong." *Id.* In that neither C.K. nor J.K. were parties to the litigation, *State ex rel. H.H.* could be interpreted as affirming the proposition that, when the best interest of children is involved in the dispute, the trial court is vested with jurisdiction to issue orders that "determine the rights" of non-parties, if only indirectly.

Another fairly common order in divorce cases restrains both parties to the divorce from having any sexual partner in the house while the children are present. *See e.g., Morris v. Morris*, 04-676 (La. App. 5 Cir. 11/30/04); 889 So.2d 1048, 1050, *writ denied,* 2004-3185 (La. 3/11/05); 896 So.2d 68.

Because the law supports an order directing Ms. Greene to ensure that Mr. Coates is not present at custody exchanges of the parties' children, this Court does not find that the trial court was without jurisdiction to issue the order. However, because the order is improper as written, the portion of the order stating, "Mr. Coates, Peyton Greene's boyfriend, shall not be present during any custody exchanges at any location" is hereby vacated. This Court renders judgment as follows: It is hereby ordered, adjudged, and decreed that both LANDON RONALD GREENE and PEYTON PETTIT GREENE shall ensure that only

Landon Ronald Greene, Peyton Pettit Greene, and the children are present at custody exchanges except as necessary in the case of an emergency situation or in extraordinary circumstances.

**Motion for Contempt**

**(Appellant's Assignments of Error Nos. 3 & 5)**

Ms. Greene further argues that the trial court committed legal error when it determined that Ms. Greene sought to have Mr. Greene held in criminal contempt of court, as opposed to civil contempt, for his failure to immediately take affirmative action to assist in retrieving the $93,600 tax credit from the IRS or having it re-assigned to Ms. Greene. In doing so, Ms. Greene argues that the trial court examined the facts under the more stringent burden of proof beyond a reasonable doubt when the correct burden should have been by a preponderance of the evidence. This Court finds that the trial court applied the wrong burden of proof to the facts, but a *de novo* review of the facts results in no change to the verdict.

*Appellate Jurisdiction*

First, Mr. Greene questions whether an appeal from the dismissal of the motion for contempt is proper. Mr. Greene cites *Legrand v. Legrand*, 455 So.2d 705 (La. App. 5 Cir. 8/28/1984), for the proposition that the trial Court's refusal to hold Mr. Greene in contempt of court is a non-appealable judgment. Mr. Greene is mistaken in his reliance on *Legrand* for the following reasons.

The court in *Legrand* did not hold that an appeal from a contempt judgment was *per se* non-appealable. Prior to 1999, a contempt judgment was generally considered an interlocutory decree which would only be subject to review using the procedure of application for supervisory writ. *See* In re *Jones*, 10-66 (La. App. 5 Cir. 11/9/10), 54 So.3d 54, 57 citing *Stiltner v. Stiltner,* 00-79 (La. App. 4 Cir. 11/8/00), 772 So.2d 909, 910; *Leblanc v. Leblanc*, 404 So.2d 530, 532 n.4 (La.

App. 4 Cir. 09/15/81). However, the 1999 amendments to La. C.C.P. art. 1915 designate certain types of judgments as final and appealable. La. C.C.P. art. 1915(A)(6); *See* In re *Jones*, 54 So.3d at 57. Among the enumerated judgments are "when the court imposes sanctions or disciplinary actions pursuant to Article 191, 863, or 864 or Code of Evidence Article 510(G)." La. C.C.P. art. 1915(A)(6). Article 191 describes the inherent power of the court, including the power to punish for contempt. In re *Jones*, 54 So.3d at 58. Articles 863, 864 and 510(G) also refer to contempt or sanctions. *Id.* Thus, courts have relied upon Article 1915(A)(6) as a basis for determining that a contempt judgment is a final judgment under La. C.C.P. art. 2083(A). *See id.*

A judgment that determines the merits in whole or in part is a final judgment. La. C.C.P. art. 1841. Courts have held that direct appeals from contempt proceedings are appropriate when the purpose of the proceedings is to hold someone in contempt for violating the orders of the court because, in that case, the judgment would be final. *Id., Pittman Const. Co., Inc. v. Pittman,* 96-1079 (La. App. 4 Cir. 3/12/97), 691 So.2d 268, 269, *writ denied*, 97-0960 (La. 5/16/97), 693 So.2d 803; *see Thibodeaux v. Thibodeaux,* 99-618 (La. App. 5 Cir. 11/10/99), 748 So.2d 1180, 1181.

The object of the proceedings in this case was to determine whether Mr. Greene should be held in contempt for violating a consent judgment entered into by the parties upon dissolution of marriage. Once the consent judgment was signed by the trial judge it became a valid order of the court, the violation of which is punishable by contempt. In re *Jones*, 54 So.3d at 68; *Parish of Jefferson v. Lafreniere Park Foundn.,* 98-345 (La. App. 5 Cir. 9/15/98), 720 So.2d 359, 363–64*, writ denied*, 98-2598 (La.10/28/98), 723 So.2d 965. The trial court's dismissal of the motion for contempt was actually a determination on the merits as to

whether Mr. Greene had violated a court order. Therefore, the judgment on the motion for contempt is appealable as a final judgment.

***Standard of Review***

The following rules have been established for the review of contempt judgments. The Louisiana Code of Civil Procedure defines contempt of court as "any act or omission tending to obstruct or interfere with the orderly administration of justice, or to impair the dignity of the court or respect for its authority." La. C.C.P. art. 221. A trial court is vested with great discretion when deciding whether a party should be held in contempt of court. *State v. Mitchell*, 15-169 (La. App. 5 Cir. 10/28/15), 178 So.3d 203, 206. The trial court's decision "to hold a party or an attorney in contempt of court is subject to review under the abuse of discretion standard." *Id.* at 205.

However, when the trial court's decision is based on an erroneous application of law, its decision is not entitled to deference on review. *Lawrence v. Lawrence*, 02-1066 (La. App. 3 Cir. 3/5/03), 839 So.2d 1201, 1202. If the trial court makes a reversible error of law, the reviewing court must examine the record *de novo* for the facts and render a judgment on the merits. *Id.* at 1202–03. The applicable burden of proof is a question of law. *See Barnett v. Barnett*, 15-766 (La. App. 5 Cir. 5/26/16), 193 So.3d 460, 466, *writ denied*, 16-1205 (La. 10/10/16), 207 So.3d 406.

***Burden of Proof***

Contempt may be either direct or constructive, criminal or civil. Direct contempt is committed in the presence of the court while constructive contempt is conducted outside the presence of the court and includes willful disobedience of any lawful judgment, order, mandate, writ, or process of the court. La. C.C.P. arts. 222 & 224(2). Mr. Greene was accused of violating orders of the court contained

within the consent judgments governing the parties' divorce. As mentioned above, the consent judgment is a judgment of the court which is punishable by contempt. Therefore, Ms. Greene's motion asked the court to find Mr. Greene guilty of constructive contempt.

A contempt proceeding may be either civil or criminal in nature depending on the court's purpose when imposing sentence. *Billiot v. Billiot*, 01-1298 (La. 1/25/02), 805 So.2d 1170, 1173 (citing *Shillitani v. United States*, 384 U.S. 364, 370 (1996)). If the purpose of the court is to force compliance with an order, the contempt proceeding is a civil matter, but if the purpose is to punish the disobedience of a court order, the proceeding is criminal. *Id.*; *Mitchell*, 178 So.3d at 206. Both parties point to *Trost v. O'Connor* for instructions on how to determine whether a contempt proceeding is civil or criminal:

> "If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court." The character of the relief imposed is thus ascertainable by applying a few straightforward rules. If the relief provided is a sentence of imprisonment, it is remedial if "the defendant stands committed unless and until he performs the affirmative act required by the court's order," and is punitive if "the sentence is limited to imprisonment for a definite period." If the relief provided is a fine, it is remedial when it is paid to the complainant, and punitive when it is paid to the court, though a fine that would be payable to the court is also remedial when the defendant can avoid paying the fine simply by performing the affirmative act required by the court's order. 06-1281 (La. App. 3 Cir. 4/4/07), 955 So.2d 246, 254 n.3, citing *Hicks v. Feiock*, 485 U.S. 624, 631–32; 108 S.Ct. 1423; 99 L.Ed.2d 721 (1988).

Ms. Greene's Expedited Motion for Contempt asked the court to "punish [Mr. Greene] by a fine and imprisonment until he complies" and "order him to refund Ms. Greene all funds owed to her, including all fines and penalties until paid in full."[10] Strictly considering the nature of the

---

[10] Practically speaking, if the trial court found Mr. Greene in contempt of court and ordered that he be imprisoned until he complied with the consent judgment, his sentence would have been completed before it began. At the time of the hearing on the motion, Mr. Greene had done everything he was required to do to comply with the orders of the judgment. Also, any fines or attorney fees awarded would look like

remedy asked for in Ms. Greene's motion for contempt, the proceeding and the punishment sought was civil in nature because monetary relief was to be paid to the complainant and any confinement was to last only until Mr. Greene performed as ordered.[11]

The burden of proof for civil contempt is by a preponderance of the evidence. In re *Jones*, 54 So.3d at 67. Having determined that the trial judge erred in determining that Ms. Greene asked the court to hold Mr. Greene in criminal contempt, this Court reviews the evidence *de novo* under the appropriate standard of proof.

*Discussion*

A judgment of constructive contempt must be based on a finding that there was an intentional, knowing, and purposeful violation of a court order by the accused without a justifiable excuse. *Torres v. Torres*, 11-156 (La. App. 5 Cir. 10/25/11), 77 So.3d 423, 425, *writ denied*, 11-2591 (La. 3/2/12), 83 So.3d 1045. A litigant should not be held in contempt of court unless he has been given a direct order by the court and has willfully disobeyed or refused to honor it, even if the litigant's acts tend to frustrate the opposing litigant. In re *Jones*, 54 So.3d at 67–68. This is true whether the proof is by a preponderance of the evidence or beyond a reasonable doubt. A review of the record reveals that Ms. Greene failed to prove this element of contempt under the correct burden.

Ms. Greene's motion for contempt states, "[t]he act of Defendant taking credit or receiving a refund check to which he knows he is not

---

punitive remedies at the time of the hearing but might have been aimed at forcing compliance at the time the contempt motion was filed.

[11] While at least one Louisiana court has found that the evidence was required to satisfy the burden of proof for criminal contempt based on the fact that the "defendants' obvious purpose in seeking to hold Ms. Rogers and her counsel in contempt was to punish them," *Rogers v. Dickens*, 06-0898 (La. App. 1 Cir. 2/9/07), 959 So.2d 940, 947, the instruction of *Hicks v. Feiok* requires looking at the character of the remedy itself rather than the underlying purpose behind it. 485 U.S. at 635-36.

entitled and thereafter failing to promptly resolve the issue is prohibited by the Consent Judgment." But the record reveals that the credit that was applied to Mr. Greene's social security number was not applied as a result of any "act" on the part of Mr. Greene. Mr. Greene specifically informed the accountant who was going to prepare his 2016 taxes that the entire credit belonged to Ms. Greene, and his taxes were filed as he instructed, with no attempt to claim the credit.

The only "act" that resulted in Mr. Greene being credited with the tax overage was the act of the IRS in accordance with its policy of allotting any such tax credits to the person listed as "taxpayer" on the joint return, which happened to be Mr. Greene. In fact, the record shows that neither party was aware that the credit had not been assigned to Ms. Greene until Ms. Greene received notice from the IRS that she owed money in an amount equal to the credit she tried to claim.[12]

Also, at the time the motion for contempt was filed, Mr. Greene had not "received" a refund check. Tommy Doussan's emails summarizing a conversation he had with the IRS on Mr. Greene's behalf confirm that the IRS, having received no instruction from Mr. Greene regarding the money, held onto it until October 11, 2017, when they issued a refund check to Mr. Greene. By that time Mr. Greene had already received instructions from the IRS on how to have the credit transferred to Ms. Greene's account. He followed those instructions.

---

[12] While Ms. Greene points out that Mr. Greene had received prior notices from the IRS seeking directions from him regarding the refund, Ms. Greene simultaneously argues that the notice she received at the end of July, also marked the third notice, marked the first time she became aware of the discrepancy. This Court is not in a position to judge a witnesses' credibility. On the face of the record, Mr. Greene's explanation that he had moved and was not accustomed to checking the mail that arrived at his physical address, in light of the fact that he gave out a P.O. Box as his mailing address, is as reasonable as Ms. Greene's explanation that she had not received prior notices from the IRS due to the fact that she moved to a new residence in May of 2017.

This Court finds that the language declaring that Mr. Greene "shall promptly endorse" future additional checks made payable to both parties or for tax refunds that belong to Ms. Greene is a direct order such that, had Mr. Greene been in possession of a check from the IRS for the tax credit at issue at the time the contempt motion was filed, he would be guilty of contempt for not endorsing the check over to Ms. Greene.[13]  This Court also finds that language to the effect that Ms. Greene "shall immediately receive full ownership and possession" of any such funds is clear enough that, had Mr. Greene attempted in any way to negotiate those funds from the IRS with the intention of keeping them for himself (i.e., if he had claimed the credit on his taxes or, in the event that he received one of the IRS notices asking what to do with the funds, had directed the agency to send the check to him with no intention of handing it over to Ms. Greene), he could properly be held in contempt of court.

However, Ms. Greene argues that Mr. Greene knowingly, intentionally, purposefully, and without excuse violated the order of the court that Ms. Greene "shall **immediately** receive full ownership and possession of all funds in question" by not acting as quickly as Ms. Greene and her counsel thought he should.  Even if this Court were to find that the aforementioned language imposes a duty on Mr. Greene to call the IRS and attempt to retrieve or reassign the credit for Ms. Greene's benefit, it is unlikely that the language is clear enough to charge Mr. Greene with knowing that the duty existed and making a conscious decision to disregard the order.  However, assuming there was a duty and that Mr. Greene was aware, a *de novo* review of the record establishes that Ms. Greene did not

---

[13] Mr. Greene did not promptly endorse the refund check he eventually received from the IRS because, according to the instructions he received from the IRS, doing so would result in fines and penalties against Ms. Greene.

prove that Mr. Greene knowingly and purposefully defied the court order by a preponderance of the evidence.

Ms. Greene contacted Mr. Greene on or about August 8, 2017, after receiving notice from the IRS that she owed an amount in excess of $93,600 relating to her 2016 tax return. He assured her that he was not aware of any credit being applied to his social security number. On August 8, 2017, counsel for Ms. Greene contacted Mr. Greene by phone and email regarding the overpayment which should have been applied to Ms. Greene's return. Counsel asked Mr. Greene to contact the IRS and inquire as to whether the credit had been applied to him and, if so, what needed to be done to have the credit transferred to Ms. Greene. Mr. Greene testified that he was out of town at the time of this conversation and advised Ms. Greene's counsel that he would investigate the situation when he returned home.

Ms. Greene argues that from August 8, 2017, when Mr. Greene received notice that the tax credit might inadvertently have been applied to his social security number, until September 25, 2017, when Mr. Greene was served with the motion for contempt, he did nothing to try to resolve the situation in Ms. Greene's favor. The record does not support this contention.

On August 22, 2017, Mr. Greene responded to an email from Ms. Greene's counsel asking if he had had any luck resolving the situation. He told her that he planned to meet with an accountant the following Tuesday. On September 14, 2017, Mr. Greene emailed Tommy Doussan, the accountant who eventually helped him resolve the situation, asking Doussan to call him about an "IRS Refund Issue" and including the contact information for Ms. Greene's counsel in the body of the email. On September 19, 2017, Mr. Greene emailed Ms. Greene's counsel to give her an update. He mentioned that he had not been able to meet with his

accountant "in the past few weeks due to the weather, his [the accountant's] busy schedule and having to go to Florida due to my mother being placed in the hospital." However, the email refers to the fact that Mr. Doussan had been in contact with Ms. Greene's counsel about the issue and that Mr. Doussan had given Mr. Greene a different number to call because Mr. Greene had not been able to speak to anyone when he called the local IRS number.[14]

Ms. Greene filed her expedited motion for contempt on September 20, 2017, and Mr. Greene was served on September 25, 2017. A text message from Mr. Greene to Tommy Doussan on September 25, 2017 asked Mr. Doussan to call Mr. Greene. Mr. Doussan indicated he was not available to talk until the next day but that he would call Mr. Greene then. On September 27, 2017, Mr. Greene sent another email to Mr. Doussan seeking his help resolving the issue. At that point, Mr. Doussan sent a power of attorney for Mr. Greene to sign allowing Mr. Doussan to speak with the IRS personally on behalf of Mr. Greene. On September 28, 2017, Mr. Doussan sent an email to Mr. Greene summarizing his conversation with the IRS. Mr. Greene informed Ms. Greene's counsel of the instructions he received from the IRS and asked them to send him the statement to sign indicating that the money should be credited to Ms. Greene's account. On October 11, 2017, Mr. Greene received the refund check and did exactly as instructed by the IRS.

*Conclusion*

The record does not support Ms. Greene's contention that Mr. Greene waited "months" to perform any act calculated to reassign the tax credit to

---

[14] This Court recognizes that Mr. Greene admitted to not calling the IRS between August 8, 2017 and September 13, 2017 in his answers to interrogatories propounded by Ms. Greene.

Ms. Greene. Nor does the record support the contention that Ms. Greene was forced to file a motion for contempt before Mr. Greene took any steps to resolve the problem. While there is evidence that a solution to the problem was reached within days of Ms. Greene filing her Expedited Motion for Contempt, it does not follow that Mr. Greene did not attempt to resolve the situation until he received notice that the contempt motion had been filed. The record shows that approximately seven weeks passed between the date Mr. Greene received a request to contact the IRS to have the credit reassigned and the date Mr. Greene received instructions from the IRS about how to perfect the reassignment.

The consent judgment ordered Mr. Greene to "promptly endorse" refund checks he received and contained language that Ms. Greene "shall immediately receive full ownership and possession" of such funds. Mr. Greene acted promptly once he received a refund check from the IRS. Furthermore, Ms. Greene's ownership of the funds was never in question as far as Mr. Greene was concerned, and her possession was admittedly delayed but never denied. This Court is not prepared to interpret the word "immediately" so literally as to characterize a few weeks delay as an intentional, knowing, and purposeful violation of the court order at issue. The judgment dismissing/denying the motion for contempt is affirmed.

### Request for Injunction Against Harassment

### (Appellant's Assignments of Error Nos. 4 & 6)

Finally, Ms. Greene alleges that the trial court committed legal error in its adjudication of her "Amended Request for Injunctive Relief Prohibiting Harassment Pursuant to La. R.S. 9:372.1," by requiring that Ms. Greene satisfy the burden of proof for injunctive relief under La. C.C.P. art. 3601. Finding no error in

this portion of the trial judgment, this Court affirms the dismissal of the request for injunctive relief.

Ms. Greene filed her request for injunctive relief citing La. C.C.P. art. 3944 in conjunction with La. R.S. 9:372.1. Pursuant to La. C.C.P. art. 3944, "[e]ither party to an action for divorce may obtain injunctive relief as provided in Part V of Chapter 1 of Code Title V of Code Book I of Title 9 (R.S. 9:371 et seq.) of the Revised Statutes without bond." La. R.S. 9:372.1 provides, "[i]n a proceeding for divorce, a court may grant an injunction prohibiting a spouse from harassing the other spouse." Ms. Greene suggests that the injunctions referenced in La. C.C.P. art. 3944 are issued as a matter of law and require no showing of irreparable injury, loss, or damage: the standard for seeking an injunction pursuant to La. C.C.P. art. 3601.[15] At least while the divorce is pending, Ms. Greene's premise is true. For example, La. R.S. 9:371 allows for an injunction to prevent alienation and encumbrance of community property, and the party seeking an injunction is not required to prove that alienation or encumbrance is contemplated or imminent. Ms. Greene cites, *Hendrick v. Hendrick*, to argue that Article 3944 "contemplates allowing injunctive relief as long as the necessity for it continues, regardless of whether it was requested prior to or after the judgment of divorce." 470 So.2d 449, 457 (La. App. 1 Cir. 5/29/85).

However, Mr. Greene correctly argued that La. R.S. 9:372.1 does not grant the trial court authority to issue an injunction against harassment after the

_____

[15] Ms. Greene argues on appeal that the trial court, having twice denied Mr. Greene's peremptory exception of no right of action, in which he claimed that La. R.S. 9:372.1 was only applicable during the pendency of a divorce proceeding, the court was restrained by the "law of the case" doctrine from holding Ms. Greene to the higher burden of proof required by La. C.C.P. art. 3601. An exception of no right of action is a peremptory exception which, if granted, declares the plaintiff's claim legally non-existent due to the fact that the plaintiff is not included within the class of persons to which the law grants a cause of action. See *Hershberger v. LKM Chinese, L.L.C.,* 14-1079 (La. App. 4 Cir. 5/20/15), 172 So.3d 140, 143. The "law of the case" doctrine does not prevent a trial court from reconsidering a decision to overrule a peremptory exception. *Med. Review Panel Proceedings v. Ochsner Clinic Found.*, 17-488 (La. App. 5 Cir. 3/14/18), 241 So.3d 1226, 1229, *writ denied sub nom. In re Med. Review Panel Proceedings*, 18-0594 (La. 6/1/18), 244 So. 3d 435; see La. C.C.P. art. 928. However, the court did not grant an exception of no right of action. The trial court considered whether Ms. Greene's facts met the applicable burden of proof set out in La. C.C.P. art. 3601.

judgment of divorce is entered. When *Hendrick* was decided in 1985, La. C.C.P. art. 3944 read, "[e]ither party to an action for separation from bed and board or divorce may obtain injunctive relief without bond prohibiting the other party from disposing of or encumbering community property." The court in *Hendrick* considered only whether an injunction preventing alienation or encumbrance of community property could be issued subsequent to the judgment of divorce. 470 So.2d at 457. The court found that the injunction remained necessary because the community property had not yet been inventoried or partitioned. *Id.*

Injunctions issued pursuant to La. R.S. 9:372 and 9:372.1 are incidental to proceedings for divorce or separation. *See Walters v. Walters*, 540 So.2d 1026, 1029 (La. App. 2 Cir.2/22/89); *Steele v. Steele*, 591 So.2d 810, 812 (La. App. 3 Cir. 12/18/91); *Lawrence v. Lawrence*, 02-1066 (La. App. 3 Cir. 3/5/03), 839 So.2d 1201, 1203. Therefore, injunctions issued during the pendency of the proceeding, but not specifically continued or ordered in the later judgment, terminate by operation of law at the time of the final judgment. *Walters*, 540 So.2d at 1029; *Steele*, 591 So.2d at 812.

Additionally, the statute's plain language applies to *spouses* involved *in a proceeding for divorce*. *See Lawrence*, 839 So.2d at 1203. Because other statutes dealing with divorce specifically state that a party can act "[i]n a proceeding for divorce, or thereafter," the *Lawrence* court concluded that the legislature intended that the injunctive relief provided for in La. R.S. 9:372 was not available to the plaintiff years after the judgment of divorce was entered.

In the context of community property, the issuance of an injunction to prevent alienation or encumbrance after the final judgment of divorce may still be necessary, and it still makes sense to impose little to no burden on the spouse seeking the injunction. The parties are in the same position post-divorce as they were prior to the judgment when the property remains unseparated. More

importantly, the window for the application of La. R.S. 9:371 (injunctions against alienation and encumbrance of community property) is not indefinite. The same justifications are not present in the context of injunctions against abuse and harassment.

Ms. Greene seeks to avail herself of La. R.S. 9:372.1 based on the fact that there are still unresolved issues in her divorce: the motion for contempt relates to community property, and the alleged harassment began before the divorce was final. However, Mr. Greene and Ms. Greene are parties to consent judgments which govern their post-divorce relationship. The final consent judgment states that all property issues are resolved between the parties and assigns duties going forward to deal with any other issues that may arise. The judgment of divorce was entered in this case over three years ago. The "necessity" contemplated in *Hendrick* is not present in this case. There is no reason why Ms. Greene should be entitled to an injunction against harassment without satisfying the burden of proof required under La. C.C.P. art. 3601 three years after the divorce judgment. The trial court was correct in finding that Ms. Greene could seek an injunction against Mr. Greene but only if she did so under the appropriate statute, La. C.C.P. art. 3601.

To obtain an injunction pursuant to La. C.C.P. art. 3601, a plaintiff must typically prove by a preponderance of the evidence that irreparable injury, loss, or damage will likely result if the injunction is not granted. La. C.C.P. art. 3601; *Lassalle v. Daniels*, 96-0176 (La. App. 1 Cir. 5/10/96), 673 So.2d 704, 708, *writ denied*, 96-1463 (La. 9/20/96), 679 So.2d 435. Irreparable injury or loss is that which cannot be compensated by money damages or measured by pecuniary standards. *See Guilbeaux v. Guilbeaux*, 08-17 (La. App. 3rd Cir. 4/30/08), 981 So.2d 913, 917–18. For that reason, courts often refuse to issue an injunction when there is another adequate legal remedy. *Id.*; *Lassalle*, 673 So.2d at 709. A

civil action in tort for damages is usually an adequate remedy that prevents courts from issuing injunctions against torts such as defamation and harassment. *See Lassalle*, 673 So.2d at 709–10 (upholding an injunction against defendant based on a showing that his defamatory and insulting speech toward plaintiff was accompanied by real and imminent threats to her person, but observing that the law would require a reversal of an injunction if the defendant's calling the plaintiff a "whore" and a "slut" had merely been unfavorable, distasteful, injurious to her reputation, or defamatory); *Guilbeaux*, 981 So.2d at 917–19 (finding that plaintiff was not entitled to an injunction preventing her son and daughter-in-law from invading her privacy by continuing to come to her house asking her to drop a lawsuit against them after she expressed a desire to be left alone).

However, Ms. Greene argues that the trial court erred in requiring a showing of irreparable injury because Mr. Greene's behavior toward her constitutes a direct violation of a prohibitory law: namely, stalking, a violation of La. R.S. 14:40.2. Courts have held that "[a] plaintiff is entitled to injunctive relief without the requisite showing of irreparable injury when the conduct sought to be restrained is unlawful, as when the conduct sought to be enjoined constitutes a direct violation of a prohibitory law."[16] *Louisiana State Bar Ass'n*, 15 So.3d at 168; *Lafreniere Park Found. v. Friends of Lafreniere Park, Inc.*, 97-152 (La. App. 5 Cir. 7/29/97), 698 So.2d 449, 452, *writ denied*, 97-2196 (La. 11/21/97), 703 So.2d 1312.

As Ms. Greene failed to object to the District Court's statement of the burden at the hearing and also failed to argue a violation of La. R.S. 14:40.2 at any time prior to this appeal, her argument is not properly before this Court. Nevertheless, it is evident that the trial court considered whether Ms. Greene

---

[16] Some case law suggests that a *prima facie* showing that the conduct is prohibited by law also results in the plaintiff not having to show an absence of other adequate remedies at law, another typical requirement for obtaining an injunction. *See Louisiana State Bar Ass'n v. Carr & Associates, Inc.*, 08-2114 (La. App. 1 Cir. 5/8/09), 15 So.3d 158, 168, *writ denied*, 09-1627 (La. 10/30/09), 21 So.3d 292.

proved the act of harassment, as defined by Louisiana law, by a preponderance of the evidence and determined that she did not.

Stalking is "the intentional and repeated following or harassing of another person that would cause a reasonable person to feel alarmed or to suffer emotional distress." La. R.S. 14:40.2(A). It includes, as Ms. Greene quotes in her brief, "the intentional and repeated uninvited presence of the perpetrator at another person's home . . . which would cause a reasonable person to be alarmed, or to suffer emotional distress as a result of verbal, written, or behaviorally implied threats . . . bodily injury. . ." *Id.* "Harassing" is defined in the statute as "the repeated pattern of verbal communications or nonverbal behavior without invitation which includes but is not limited to making telephone calls, transmitting electronic mail, sending messages via a third party, or sending letters or pictures." *Id.*

Although Ms. Greene did not argue that Mr. Greene's conduct constituted stalking during the proceedings on the request for injunctive relief, it is evident from the record that the judge was aware of the definition of stalking and its qualification as harassment under several statutes. During a hearing on Mr. Greene's renewed exception of no right of action, the judge dealt directly with Mr. Greene's assertion that "the actions that were stated in the petition do not rise to the level of harassment." The court disagreed, stating that the actions alleged in Ms. Greene's petition, if true, "may even rise to the level of . . . stalking . . . under the Domestic Abuse Protection Act."

The Domestic Abuse Assistance section (La. R.S. 46:2131 *et. seq.*) of the Protection from Family Violence Act defines "domestic abuse" as including "any offense against the person, physical or non-physical, as defined in the Criminal Code of Louisiana, except negligent injury and defamation." La. R.S. 46:2132(3). Stalking is included in the list of offenses against the person in the criminal code. Furthermore, the language used in the District Court's reasons for judgment

suggest an understanding that a requirement for recovery on a claim of stalking or harassment is that a *reasonable person* would be alarmed or distressed by the conduct at issue.

After Ms. Greene presented her case, the trial court made a factual determination that "[n]one of the evidence presented showed that Mr. Greene had threatened or harassed Ms. Greene in any way.  The facts presented would, at best, be characterized as petty bickering between the parties."  Using language strongly correlative of the reasonable person standard, the court found that Ms. Greene's subjective feelings of being threatened would not satisfy the burden of proof for an injunction because the law imposes an objective standard.  The trial court went on to say of Ms. Greene, "[h]er perceived feelings of being threatened and harassed by Mr. Greene are not substantiated by any actual, objective evidence she presented."

Much of the court's opinion is based on credibility determinations.  The trial judge was presented with testimony from three witnesses on the issue of harassment.  When there is conflicting testimony, "reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." *Morris v. Morris*, 04-676 (La. App. 5 Cir. 11/30/04), 889 So.2d 1048, 1054–55, *writ denied*, 04-3185 (La. 3/11/05), 896 So.2d 68.  Only where "documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story," may the appeals court find manifest error in the fact determined. *Id.*  We find no such error in the trial judge's choice to give credit to Mr. Greene's explanations for his actions or her decision to grant less weight to Ms. Greene and Mr. Coates' versions of events.  Nor do we find error in the denial of the request for injunctive relief.

**CONCLUSION**

For the foregoing reasons, this Court finds that the trial court properly considered the question of whether Mr. Greene had the right to record custody exchanges. Based on the record, Mr. Greene was entitled to the trial court's judgment declaring that neither party is precluded from recording custody exchanges. That portion of the judgment is affirmed.

Likewise, the Court finds that the issue of Mr. Coates' presence at custody exchanges was properly addressed by the trial court because the best interest of the parties' children was necessarily at issue. However, the trial court improperly addressed the judgment to Mr. Coates instead of to Ms. Greene. Therefore, the portion of the order that reads, "Mr. Coates, Peyton Greene's boyfriend, shall not be present during any custody exchanges at any location" is hereby vacated. It is hereby ordered, adjudged, and decreed that both LANDON RONALD GREENE and PEYTON PETTIT GREENE shall ensure that only Landon Ronald Greene, Peyton Pettit Greene, and the children are present at custody exchanges except as necessary in the case of an emergency situation or in extraordinary circumstances.

Regarding Ms. Greene's motion for contempt, this Court finds that Ms. Greene had the burden of proving by a preponderance of the evidence that Mr. Greene willfully, knowingly, and without excuse violated a direct order of the court declaring that Ms. Greene was to receive ownership and possession of the tax credit in question and that Mr. Greene was to endorse any refund checks he received over to Ms. Greene. Since, the trial court seemingly applied the burden of proof for criminal contempt, which is proof beyond a reasonable doubt, we reviewed the record *de novo* for facts demonstrating that Mr. Greene was in contempt of the consent judgments regarding the tax credits and refunds. The consent judgment did not directly order Mr. Greene to contact the IRS or take any affirmative action to have the tax credit reassigned to Ms. Greene once he was made aware of the problem. However, assuming that the duty existed, Ms. Greene

failed to establish by a preponderance of the evidence that Mr. Greene intentionally and knowingly defied the court order by failing to accomplish the task within the first few days or weeks of being notified of the issue. Accordingly, the judgment dismissing/denying the motion for contempt is affirmed.

Lastly, this Court finds that the trial court appropriately dismissed/denied Ms. Greene's request for injunctive relief against harassment. The trial court was correct in determining that Ms. Greene's request for an injunction should have been brought under La. C.C.P. art. 3601. Pursuant to Article 3601, Ms. Greene was required to prove by a preponderance of the evidence that irreparable harm was likely to result unless the injunction was granted. The trial court's findings of fact were reviewed for abuse of discretion, and the ruling stands.

## AFFIRMED IN PART, VACATED IN PART, AND RENDERED

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

MARY E. LEGNON
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

### NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **DECEMBER 11, 2019** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 19-CA-37

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE DANYELLE M. TAYLOR (DISTRICT JUDGE)
BRYANT S. YORK (APPELLANT)          MATTHEW S. ALMON (APPELLANT)

**MAILED**
ALBERT J. GARDNER, III (APPELLEE)
ATTORNEY AT LAW
6380 JEFFERSON HIGHWAY
HARAHAN, LA 70123

TERRI M. MILES (APPELLEE)
ATTORNEY AT LAW
830 3RD STREET
GRETNA, LA 70053

PHILLIP A. WITTMANN (APPELLANT)
BROOKE C. TIGCHELAAR (APPELLANT)
ATTORNEYS AT LAW
909 POYDRAS STREET
SUITE 3150
NEW ORLEANS, LA 70112